Argued January 24; affirmed March 27, 1934

# PURCELL *v.* WASHINGTON FIDELITY NATIONAL INSURANCE COMPANY

(30 P. (2d) 742)

*Milton R. Klepper,* of Portland (Robert W. Gilley, of Portland, on the brief), for appellant.

*Frank C. Howell,* of Portland (Wilbur, Beckett, Howell & Oppenheimer, of Portland, on the brief), for respondent.

ROSSMAN, J.  The policy of insurance which the plaintiff is seeking to enforce against the defendant contains the following provisions:

"Confining Illness Indemnity Payable for Life

(1) The company will pay  *  *  *  for disability resulting from diseases,  *  *  *  and which confines the Insured continuously within doors and requires regular visits therein by a legally qualified physician; provided said disease necessitates total disability and total loss of time.

Non Confining Illness

(2) The company will pay  *  *  *  at the rate per month of one-half of the monthly illness indemnity hereinafter specified, but not exceeding two months for disability resulting from disease,  *  *  *  which does not confine the Insured continuously within doors  *  *  *"

The sum payable under the first clause is $100 per month.

June 4, 1928, the plaintiff suffered a paralytic stroke, and another in August of the same year. Following the first stroke, and until April of 1930, the defendant regularly paid the plaintiff $100 a month indemnity, but since April 1, 1930, has declined to make further payments at that rate, claiming that the plaintiff's illness no longer confines him within doors.

The assignments of error are predicated upon an order denying a motion for a nonsuit and upon the instructions to the jury. These various assignments present only one issue: whether the plaintiff's present condition is within the contemplation of the confinement clause, above quoted. We shall now review briefly the evidence.

The combined effect of the two above-mentioned strokes deprived the plaintiff of his speech for a long period of time, and still render his right leg and arm useless. For several months after August the plaintiff was continuously confined to his bed except for an occasional short period when he reclined upon a davenport in the living room of his home. In September of 1928 efforts were made to help him regain his power of speech, and after three months he was able to utter a word or two. At the time of the trial, March 22, 1933, witnesses declared that they could not understand him unless they paid close attention. A physician testified: "Due to the fact that the hemorrhage of the brain which he had was in the region of the speech center, the speech center was involved so that if he wanted to say a word he would find that word just as easily and quickly as he would find the point he wanted to put his hand on—it wasn't there. This to him is very nerve-

racking.'' The same witness also testified that the plaintiff's inability to express himself causes him frequently to sob. Other witnesses testified that he often cries as he contemplates his helpless condition. His wife testified that his pillow is frequently wet at night time, due to weeping caused by nervousness. According to the plaintiff's wife, ''a good many months'' after the stroke the plaintiff had progressed sufficiently so that he could shuffle about the house with the help of a cane and the assistance of a member of the family. The witnesses agree that the plaintiff is unable to get up or down stairs without help, and, according to those who testified, he is never left alone for fear that he may fall. A neighbor described his present physical condition as ''totally disabled'', and, when asked about his mentality, replied: ''I would say that he is very much like a child.'' The uncontradicted testimony shows that the plaintiff rests very poorly at night, that when he is left by himself he worries, becomes nervous, despondent, and weeps. The uncontradicted testimony also shows that the plaintiff is unable to bathe and dress himself. Even now there occur periods of time when he is confined to his bed for several days in succession. A physician has attended him regularly two or three times a week since June of 1928. At some time in 1929 the plaintiff had made sufficient improvement so that on warm days he would be carried to the front porch where he remained for short periods of time. July 23, 1929, Dr. M. K. Hall, who was then attending him, advised the plaintiff's wife in a letter: ''It would be very, very wise if it could be arranged to get Mr. Purcell to a change—out-door change—the seashore, for instance —It could contribute considerably to a quicker recovery.'' After receipt of this letter the family made

an effort to take the plaintiff to the Oregon coast, but before they had progressed more than several miles the plaintiff became noticeably worse and it was necessary to return home. Since that time no further effort has been made to go to the coast. However, the physicians continue to advise the plaintiff's wife to get him into the fresh air and sunshine whenever possible. One of them testified: "The idea of being out of doors is as much for the change of scenery, for improving his mental outlook as it is for the physical side of it." All of the physicians who testified agreed that getting out of doors is helpful to one in the plaintiff's condition. According to his wife, the plaintiff has been out of his home upon the following occasions: He has been to a barber shop located within one block of his home "five or six times, if that many". Once or twice he walked the distance with the help of his wife, and the other times was taken in an automobile. Upon one occasion he was taken to the home of a friend. At times he was driven two or three blocks from his home where he sat in the parked car viewing the distant mountains. On another occasion he was driven three or four blocks to a place where he could view the golf course on which he had played before his illness. Sometimes he has been taken for a ride to the business section of Portland, and at other times taken to the neighborhood motion picture theater. More than one of the witnesses described the great difficulty encountered in getting the plaintiff into the automobile. On some occasions he has been in his yard. When his wife was requested to estimate the number of times he had been taken to the motion picture theater, she replied that they were "very, very few", and that he was never able to sit through the entire performance. When asked if the total number of times the plaintiff had been out of

his home would aggregate 50, she was uncertain, but replied: "I don't think so, no, because there would be months at a time Mr. Purcell couldn't be taken out of the house. Then there would be another time when in a week I could take him out a couple of times." Some of these trips were made at night when the plaintiff, due to nervousness, was unable to sleep. His wife testified that the physicians had advised her to take the plaintiff for a ride whenever such conditions developed. She also testified that the few visits to the motion picture theater and the one to the home of a friend were for the sole purpose of trying to get the plaintiff's mind off himself and to prevent him from becoming morose. She repeatedly testified that those trips and the excursions to the yard, front porch and the rides in the automobile were made in an endeavor to comply with the physicians' directions, adding that, since June 4, 1928, the plaintiff had been continuously confined in the house "except on the advice of physicians". Doctor Robert S. Graffis, plaintiff's physician, testified that since May, 1930, the plaintiff's condition has shown very little improvement. The plaintiff did not testify, the explanation being made that he was unable to do so. One of the physicians expressed it thus: "Mentally, he is very easily upset." Doctor Graffis described the plaintiff's condition thus: "It is very difficult for him to walk, difficult for him to use his right arm. Oftentimes he will have to take the other hand and bring it over in order to get it where he wants it. Difficult for him to talk. Oftentimes he starts to say something and he forgets entirely—or unable to say what he wants to say, and he has to be assisted around the house, and get up and down steps he has to be helped, and he has to be helped to take a bath, put in and out of the tub and taken in

.and out of the tub. In fact, he is unable to help himself in very many things * * * I have advised him to take exercises but he gets tired out so quickly he can scarcely take any exercise. * * * I have prescribed for him to take a hammer or rubber mallet and try to learn so he could hit in the same place, but he hits all over when he tried to strike the hammer.'' Doctor George A. Cathey described the plaintiff's present condition as follows: ''Even my last call, in just talking to him, getting him to try to walk without shaking that hand or holding it he would want to weep. When he would talk to me he would apologize many times for his inability to tell me what he wanted to tell me. Then he would shed tears then, just my trying to talk to him and being just as calm as I could upset him very much.'' Upon cross-examination, this physician testified as follows: ''Q. The conditions that you found did not confine him to the house continuously? A. No, not from a physical standpoint. Q. Nor from a mental standpoint? A. No, there is no reason why he should not be taken out for exercise and change of scene.''

We have refrained from making reference to the many parts of the testimony which show that the plaintiff is wholly unable to attend to his business or engage in any act of usefulness because his disability is expressly admitted by the defendant. For instance, its brief states: ''Respondent's disability is admitted.''

The above testimony is without contradiction, although the defendant produced witnesses. During the time in which it paid the plaintiff 23 monthly payments of $100 each, its agent, upon delivering the checks, entered the plaintiff's house and observed the conditions. He testified briefly. Towards the close

of the payment period defendant employed secret investigators who not only took note of the plaintiff but also made inquires in the neighborhood. One of the defendant's witnesses testified that upon his visits he always found the plaintiff in his home, but added: "One time I think he was out but I couldn't prove it." A physician called by the defendant testified that the plaintiff's case was "an average case of paralysis, so-called hemiplegia". At the defendant's request, he examined the plaintiff October 14, 1928, and May 4, 1930. When questioned whether the plaintiff was necessarily confined to the house October 4, 1928, the witness evaded by replying, "He wasn't bedridden at any rate". When asked concerning the plaintiff's condition May 4, 1930, he replied: "He was quite a bit better. * * * He was able to be out, but he was still physically incapacitated, but he was shuffling around just the same as if he were moving around the room or moving outside." He added, "These cases should be out in the sunlight and out in the air. * * * The average case of paralysis perhaps the outside air or sunshine and things of that sort benefit them." The witness swore that in May, 1930, it would have been possible for the plaintiff to have gone to shows and on automobile rides and that these diversions would have benefited him. He expressed the opinion that at that time the plaintiff's condition was "not strictly house-confining", but upon cross-examination, when asked, "Do you mean by house-confinement that one is unable to get out for any purpose?" replied, "Practically so".

We believe that the above is a fair review of the evidence. The jury returned the following special verdict, in addition to its general verdict of $3,400, and $500 attorney's fee:

"For what period or periods, if any, since June 4, 1928, was the plaintiff confined continuously within doors by reason of disease? A. June 4, 1928, up to and including January, 1933.

"What period or periods, if any, since June 4, 1928, was the plaintiff regularly visited at his home by a duly qualified physician? A. June 4, 1928, up to and including January, 1933." (The amended supplemental complaint was filed January 28, 1933).

We are now called upon to determine whether the facts recited above support the plaintiff's claim that his illness confined him "continuously within doors" and required "regular visits therein by a legally qualified physician" during the period of June 4, 1928, to January, 1933. The defendant does not claim that the plaintiff has not been regularly attended in his home by a legally qualified physician, and since evidence supplied by the plaintiff substantiates this part of the claim, we deem it conceded. But the defendant contends that (a) the plaintiff's illness no longer requires him to stay indoors, and (b) that his excursions outdoors have been for recreational purposes.

■ While much of the above testimony came from the plaintiff's family, his neighbors and his physicians, and may, therefore, be unconsciously colored in his favor, nevertheless, we believe that it fully supports a conclusion that he is virtually helpless and requires constant attention. We likewise believe that the above evidence warrants a conclusion that when the plaintiff stepped into his dooryard, went for a ride, or attended a theater he did not do so for recreation, but because his wife, prompted by the advice of the attending physicians, wanted him to obtain the healing benefits of the fresh air or get a change of scene. The sunshine and a ride in the fresh air had become soothing curatives for him.

■ But the problem still remains whether the fact that the plaintiff went outdoors, possibly 50 times in a period of four years and seven months, obedient to the direction of his physicians, denies him the benefit of the house-confinement clause of the policy. The defendant, after directing attention to the fact that the policy contains a provision for non-confining illness, as well as the one which the plaintiff seeks to invoke, argues that, therefore, the latter should receive a strict construction. It cites in support of this contention: *Isaacson v. Wisconsin Casualty Association*, 187 Wis. 25 (203 N. W. 918); *Reeves v. Midland Casualty Co.*, 170 Wis. 370 (174 N. W. 475); *Sheets v. Farmers' & Merchants' Mut. Life & Casualty Association*, 116 Kan. 356 (225 P. 929); *Richardson v. Interstate Business Men's Acc. Association*, 124 Kan. 685 (261 P. 565); Joyce's Law of Insurance (2d Ed.) p. 5238.

The first of the above-cited decisions contains virtually nothing upon the subject under investigation. In the other cases the courts, after finding no ambiguity in the policy, expressed added confidence in their conclusions from the fact that the policies recognized two degrees of illness: (a) house-confining illness; and (b) non-house-confining illness. Joyce on The Law of Insurance (2d Ed.), in the above-cited section, expresses the point thus:

"Again, although considerable liberality has been given to the words 'confinement to the house' still where the provision is: 'necessarily and continuously confined within the house' and there is also a provision as to 'non-confining sickness indemnity, payable when the insured shall be wholly and continuously disabled,' etc., and insured claims under the first provision, it is held that said first clause by contrast with the second does not include frequent interruptions of the continuity of confinement within the house but it means

that the benefit is payable only to an insured suffering from such serious malady that he is not able to break his confinement to the house with journeys of any substantial character outside its confines, as the word 'continuously' means, in its common acceptation, uninterruptedly, in unbroken sequence, without interruption or cessation, without intervening time; and, although it does not exclude imperative removals, as in case of a transfer to a hospital and back again, it does not include frequent changes from the house to other places and returns; and 'within the house' means one house in the absence of some exigency, especially where the policy also requires that insured be 'therein regularly visited by a legally qualified physician'.''

██ In none of the above decisions, and in no other which has come to our attention, has any court placed an unnatural construction upon a house-confinement clause merely because the policy contained further clauses. In each case the court sought the meaning which the insurance company should have known a prospective purchaser of the policy would place upon its phraseology. The presence or absence of further clauses can have but little effect upon the meaning of the confinement clause. Since nothing to the contrary appears, we are required to place upon the words of the policy their primary and general meaning: Section 9-217, Oregon Code 1930. If the clause under review is susceptible of more than one equally proper construction, we must give the plaintiff the benefit of the most favorable one because the promise was made for his benefit: Section 9-220, Oregon Code 1930. If the meaning of this clause is ambiguous, the doubt must be resolved against the defendant which was the author of the instrument: *Zimmerman v. Union Automobile Ins. Co.,* 133 Or. 600 (291 P. 495).

The defendant insists that the policy contains no ambiguity, and that the meaning of the two clauses is free of doubt. Prompted by the holdings in *Rocci v. Massachusetts Accident Co.*, 222 Mass. 336 (110 N. E. 972, Ann. Cas. 1918C, 529), and *Rocci v. Massachusetts Accident Co.*, 226 Mass. 545 (116 N. E. 477), it urges that any excursion by the plaintiff into the outdoors denied to him the indemnity promised by the house-confinement clause except (we quote from defendant's brief) "if the removal is by reason of an exigency or emergency such as not to indicate a change in the insured's condition which requires him to stay indoors and which prevents his going out for normal activities such as recreation or business".

Although the defendant contends that the policy is free from any ambiguity, it admits that clauses similar to the one under consideration have received constructions "tending to support respondent's views" by the United States Circuit Court of Appeals for the Third District, and by the Supreme Courts of Arkansas, Colorado, Texas and Washington. Before reviewing the decisions of those jurisdictions, we add that the defendant contends that the weight of authority supports its view. Defendant's admission that the foregoing jurisdictions have placed upon policies of the character written by it constructions adverse to its position is deserving of more than passing notice. The policy before us was sold September 29, 1926, and, no doubt, its phraseology is the product of skilled lawyers in its employ who were familiar with the decisions of the courts. The Arkansas, Colorado and Federal decisions to which defendant makes reference, and which we shall in a moment review, were in the published reports long before this policy was sold to the plaintiff.

The Texas decision was announced in 1927, but *Southern Surety Co. v. Diercks* (Texas Civil Appeals), 250 S. W. 755, the progenitor of the case cited by the defendant, was decided in 1923. Thus, when the defendant wrote this policy it knew of the construction which courts of high standing had placed upon the phraseology which it selected. If there are decisions in conflict with those which we are now mentioning, then an ambiguity exists, and, under the rules aforementioned, the plaintiff must be given the benefit of the doubt. We shall now review the Arkansas, Colorado, Texas, Federal and Washington decisions.

In *Interstate Business Men's Acc. Ass'n v. Sanderson,* 144 Ark. 271 (222 S. W. 51), indemnity was payable in the event illness compelled "the insured to remain continuously and strictly within the house". The insured, who was afflicted with nephritis, made a daily trip to the post office to get mail, twice a day walked four blocks to a mineral well to get water which he drank, pursuant to his physician's orders, occasionally went to a store to make purchases, and spent much time upon his porch or at a pavilion near the well in order to get the benefit of the sunshine. The supreme court, in holding that the trial court committed no error when it permitted the jury to determine whether the insured was substantially confined within doors, declared:

"Short trips away from the house for purposes necessary to bring beneficial results to the health of the insured does not take the case out of the operation of the language of the policy, which requires confinement to the house."

In *Massachusetts Protective Ass'n of Worcester v. Oden,* 186 Ark. 844 (56 S. W. (2d) 425), the policy

promised payment as long as the insured was "necessarily confined within the house". The insured was disabled with myocarditis. Under the advice of physicians, he took frequent short automobile rides for fresh air, and a train trip to Corpus Christi, Texas. On another occasion he made an automobile trip to Monticello, Arkansas, to spend Thanksgiving with relatives. Based largely upon the authority of *Interstate Business Men's Accident Ass'n v. Sanderson,* supra, the court held that it could not say, as a matter of law, that he was not necessarily confined within his house. In *Mutual Benefit Health & Accident Ass'n v. McDonald,* 73 Colo. 308 (215 P. 135), the policy promised payment for an illness "confining the insured continuously within doors". The insured, having become afflicted with septicemia, sought indemnity for a period when he was confined to his home, with the exception of a trip which he took each week to the office of his physician six miles away for the purpose of receiving medical treatment. In sustaining the trial court which allowed payment for the contested period, the court said:

"The insured took out this policy as an indemnity against loss of time in case of total disability to pursue his usual avocation. That is the principal object of the contract. The protection which it affords is what the insured paid his premium for. It is in connection with this, the main object of the contract, that the meaning of its other subordinate or limited conditions and provisos should be determined. * * * We are of opinion that the interruption or break in the continuity of the confinement of the insured within doors is not such a departure from the contract, or in such violation of its provisions, as to defeat a recovery of full indemnity."

In *Federal Surety Co. v. Wait,* 297 S. W. 312 (Texas), the policy promised payment if the insured

should be "strictly and continuously confined within the house by reason of an illness". The insured was a stenographer who suffered a nervous breakdown and was subjected to an operation for the removal of her tonsils. She was never visited at her home by a physician, but three times a week went to his office. While on her way to the physician's office she made purchases downtown and obtained her lunch. In sustaining the judgment of the lower court in the insured's favor, the decision states:

"The purpose that must have been in the mind of the insured at the time of the taking out of her policy was that she would thereby be indemnified for loss of time for the period specified if occasioned by sickness which would totally incapacitate her from performing her usual work. * * * We think it is evident, as said in one of the cited cases, that the requirement that the insured must be confined within her house or home is but evidentiary. The only legal purpose for the insertion of such a requirement would seem to be that thereby a total loss of time and incapacity to labor would be shown with certainty."

An earlier Texas case to similar effect is *Southern Surety Co. v. Diercks,* 250 S. W. 755.

In *Aetna Life Insurance Co. v. Willetts,* 282 Fed. 26, the policy made indemnity payable whenever the insured was "necessarily confined in the house". He became afflicted with bronchitis and asthma. From his home in Pittsburgh he went to Philadelphia for examination by a specialist. The latter advised him to go to Florida. There he stayed in hotels, spending much time upon the porches. From Florida he returned to Pittsburgh, stopping en route in Philadelphia to again consult the specialist. He remained for eight weeks in Pittsburgh and then, upon advice of a physician, went to the Maine woods, stopping en route

at Boston to consult another specialist. During his stay in Maine he made a few short rides upon a lake, upon one occasion fishing. After having spent several weeks in Maine, he returned to Pittsburgh, stopping again for a short time in Boston to consult his physician. The trial judge submitted to the jury the issue whether the above facts indicated that the insured was necessarily confined to his house by illness, charging the jury that "necessary confinement to the house must be given a reasonable construction. They did not mean necessarily confined continuously within the walls of the house in which the insured lived. They referred to a condition of illness and a disability which makes confinement to the house—that is, within doors—a necessity". In upholding recovery, the circuit court of appeals declared:

"That the plaintiff was completely and wholly disabled during this period is not contraverted in the proofs, and we think the uncontradicted facts in the case show a situation where reasonable-minded men might take the view that during all that time he was not only disabled, but his illness was such as necessarily confined him to the house."

In *Stewart v. Continental Casualty Co.*, 141 Wash. 213 (250 P. 1084, 49 A. L. R. 960), the policy promised indemnity provided illness "confined within the house" the insured. The insured became afflicted with acute glaucoma of her eyes. During the time that she was convalescing from the operation upon her eyes, she remained indoors, occasionally going to her physician's office, four blocks away, for treatment, and also, pursuant to his direction, taking short walks in the neighborhood. In sustaining the judgment of the trial court in favor of the insured, the court said:

"It seems to us that a sickness confinement which compels a patient to be within doors constantly, except during the time of visits of short distance and duration to his physician's office for treatment and periods of occasional exercise in the open air, all in pursuance of the physician's directions, and at all times so out of the house necessarily accompanied by another person, and all of such time spent out of the house being for the sole purpose of looking to the cure of the patient's affliction, such time of confinement and restricted movements of the patient should be considered as 'strictly and continuously confined within the house and therein be under the regular care of a legally qualified physician' within the meaning of this and other similar health insurance clauses."

In all of the above cases, with the possible exception of the one before the Federal Court of Appeals, the policy of insurance, besides containing a house-confinement clause, contained an alternative one.

The defendant cites many decisions which it contends support its position. We shall now briefly review these. In *Hesse v. United States Fidelity & Guaranty Co.*, 143 Or. 700 (21 P. (2d) 1090), we held that the insured could not recover indemnity for the expense he incurred while being taken care of outside of the hospital (ambulance fare, Portland to Astoria, round trip, specially constructed bed for his home, train fare, nurse hire, etc.) under a policy which limited the payment of indemnity to the period insured "shall be necessarily confined in the hospital". While *Rocci v. Massachusetts Accident Co.*, 222 Mass. 336 (110 N. E. 972, Ann. Cas. 1918C, 529), supports the defendant's views, the second decision in that case (226 Mass. 545 (116 N. E. 447)) constitutes a distinct liberalization of the first holding. The policy made indemnity payable whenever "the insured by reason of sickness is neces-

sarily and continuously confined within the house''. The insured became afflicted with bronchial trouble but spent little time while ill in his own home. He left it for the home of his sister, and, after remaining there for a while, went to different hospitals and sanitariums. Later, he returned to his home and then went to Italy. Much time was spent in moving to and fro. The court, in its second decision, held that he could recover until his departure for Italy, but denied recovery from that point because of a provision of the policy requiring the insured to live at a place where the insurer's physicians could examine him. In permitting recovery, the court said:

"The defendant conceded that if the plaintiff had been compelled to remove by reason of fire, by the termination of his tenancy, by order of the board of health or if he was removed by superior force, the actual continuity of confinement would have been broken within the meaning of the provision for continuous confinement within the house. * * * There is no break in the continuity of the insured's sickness of the required degree in the cases covered by the defendant's concession because, by the true construction of this clause of the policy, what is required is a degree of sickness, not the literal fact of staying in the house under all circumstances.''

In *Reeves v. Midland Casualty Co.*, 170 Wis. 370 (174 N. W. 475), the house-confinement clause limited payment to the period while the insured was ''necessarily and continuously confined within the house''. The insured was overtaken with illness and for a time was confined within the house, but later ''was able to sit out on the porch a great deal and frequently drove to the doctor's office, a distance of four miles, to be treated''. The court permitted recovery for

the time of actual house confinement, but held that such confinement "could not be reasonably construed to include time around the house, about the house, or when he was making trips to Polar and receiving treatment in the physician's office". In *Dunning v. Massachusetts Mutual Accident Ass'n*, 99 Me. 390 (59 Atl. 535), the house-confinement clause promised indemnity for a disability "requiring absolute and necessary confinement to the house". The insured was afflicted with iritis. We quote from the decision:

"The plaintiff does not claim that his disability was such as to require 'absolute and necessary confinement to the house,' or that he was, in fact, confined to the house continuously during the time for which he asks for indemnity."

The court held he was not entitled to recover for house confinement.

In *Sawyer v. Masonic Protective Ass'n*, 75 N. H. 276 (73 Atl. 168), the policy promised indemnity for the period that the insured shall be "absolutely, necessarily and continuously confined to his house". The insured was afflicted with paralysis of the throat. Once or twice a week he went to the office of his physician for treatment. Occasionally he went to a barber shop a quarter of a mile from his home. At times he stepped into the store of which he was proprietor. On another occasion he went to a beach, consulting a specialist at Boston en route. At the beach he went to a barber shop twice a week. It will be observed that this man was not disabled. In denying recovery, the court declared: "The disability must be of a nature to ordinarily confine one to the house" and stated that a man who could walk to his store, barber shop, physician's office, etc., was not confined to his house. It

made frequent reference to its earlier holding in *Scales v. Masonic Protective Ass'n,* 70 N. H. 490 (48 Atl. 1084), wherein it held:

"It would be generally understood that a sick person was confined 'to' the house, although he went into the dooryard to take sun baths or get fresh air."

It disavowed any intention of overruling that decision.

In *State ex rel. v. Cox,* 322 Mo. 38 (14 S. W. (2d) 600), the policy promised payment "if the insured shall be continuously confined within the house, not leaving it at any time or for any purpose whatsoever". The insured became afflicted with eczema and scurvy. While receiving treatment in a sanatorium he occasionally went for a walk, sometimes going to the post office, and on two occasions to the courthouse. Two or three times each week he rode on a street car to the public square where he walked about for an hour. On two occasions he took an automobile ride. The court called attention to the strict language of the house-confinement clause, and held that it was obvious that he was not within its embrace. In *Lachterman v. Mutual Benefit Health & Accident Ass'n,* (Mo. App.) 60 S. W. (2d) 646, the house-confinement clause rendered payment available for an illness "which confines the insured continuously within doors". During the period for which he claimed indemnity the plaintiff made not less than 13 visits to his physician's office, lived at the home of his sister and on two or three occasions went to his place of business to find out how his business was being conducted. Occasionally he took a walk around the block. The court held he was not entitled to recover. In *Olinger v. Massachusetts Protective Ass'n,* 221 Mo. App. 405 (278 S. W. 86), the policy required confinement to the house before indemnity

was payable. The insured was afflicted with cancer of the mouth. In his report to the company, he answered that his disability did not strictly confine him to his house, and "I was unable to leave my house for *none* days". His physician made similar replies upon his regular reports. The insured made regular visits to his physician's office, rode on street cars and on a train. The court held that it was obvious that his case was not within the house-confinement clause of the policy. In *Bucher v. Great Eastern Casualty Co.*, (Mo.) 215 S. W. 494, the policy promised payment for the period in which the insured was "totally disabled, confined within the house, not leaving it for any purpose, and regularly visited therein by a legally qualified physician". The insured became afflicted with an eye ailment which rendered her eyes over-sensitive to light, but which made continuous confinement in the house positively harmful. She called daily at her physician's offices for treatment. Upon his advice she went to Arcadi, Missouri, and later to Union, Missouri. The court held that the above provision of the policy was free of ambiguity and denied her recovery. In *Bradshaw v. American Benevolent Ass'n,* 112 Mo. App. 435 (87 S. W. 46), the policy required that the insured, "be entirely and continuously confined in bed" before indemnity was payable. The insured was afflicted with neurasthenia, and, according to the decision, "was never, even when at his worst, confined to the bed" but spent most of his time out of doors. It was clear that he was not within the bed-confinement clause of his policy, and the court held that he could not recover. But see *Ramsey v. General Accident Fire & Life Ins. Co.,* 160 Mo. App. 236 (142 S. W. 763), where the Kansas City division of the Missouri appellate court took a more liberal view than that ex-

pressed by the St. Louis branch in the above decisions. It allowed recovery under a house-confinement clause while the insured was traveling for medical attention and spending time outdoors for health improvement purposes. In *Hakspacher v. Aetna Beneficial Ass'n*, 55 Pa. Super. Ct. 410, the policy promised payment for the period that the insured is "strictly, necessarily and continuously confined to the house". The insured claimed payment during the time he made weekly trips from his seashore abode to his Philadelphia home for medical treatment, going on Thursday and returning on Saturday. The court held that the insured was not "strictly, necessarily and continuously confined in the house". In *Lieberman v. Columbia National Life Insurance Co.*, 47 Pa. Super. Ct. 276, the policy provided payment for a disability which "necessarily confines the insured to the house". The insured contracted tonsilitis. During the period for which he claimed indemnity he was out of his home every day calling upon his physician or going to his place of business, but not transacting any; in fact, he did not claim that he was confined to his house, but argued that the house-confinement provision was unreasonable. The court denied him relief. In *Garvin v. Union Mutual Casualty Co.*, 207 Iowa 977 (222 N. W. 25, 61 A. L. R. 633), the house-confinement clause limited indemnity to the period in which the insured was "strictly and continuously confined within the house". The court permitted the insured to recover for a period in which he frequently left his house to consult physicians, took treatment at hospitals and spent time in the sunshine. In so holding, the court declared:

"We are disposed to concur in the view expressed in some of the cases cited, that a too narrow and constricted construction should not be placed upon the

terms of this policy. 'Strictly and continuously confined within the house' in its most literal interpretation, would require that the insured stay constantly within the four walls of the house. * * * Such narrow and limited construction should not be adopted in the interpretation of contracts of this character. The record in this case disclosed that for certain periods of time described in the evidence the insured was, in fact, strictly and literally confined within the house. * * * Nor do we think that the insured is deprived of his right to recovery for such period of time as he was temporarily absent from his house for consultation with a physician in the town where he lived.''

Very little comment is required to distinguish the facts before us from those before the courts in the above cases which denied recovery. The clause under consideration is not a bed-confinement clause; it does not employ the words ''absolutely, necessarily, continuously confined to the house'', nor the words ''continuously confined within the house, not leaving it at any time or for any purpose whatsoever''; our plaintiff never left his home to go back to his place of employment; he took no week-end trips to visit a physician in a distant city; he and his physician made no statements upon the insurance company's monthly report blanks that the plaintiff was never confined to his house; his illness is not iritis, nor eczema, nor throat affection, leaving him free to go wherever he chooses; and he has not ridden around in street cars and walked about parks unattended.

In his brief, the plaintiff reviews many additional decisions, but, since some of these are reviewed in *Stewart v. Continental Casualty Co.*, 141 Wash. 213 (250 P. 1084, 49 A. L. R. 960), and others in the annotation accompanying the report of that case in the

volume last mentioned, we deem it unnecessary to make express mention of them. The Washington court, in the case last cited, expressed the trend of the authorities thus:

"The decisions of the courts touching problems of this nature are seemingly not harmonious. It seems to us, however, that such conflict is rather more apparent than real, when each decision is particularly noticed in the light of the circumstances of the particular case dealt with. Indeed, there seem to be no two cases exactly alike. The words 'confined within the house' or 'confined to the house' have seldom been taken by the courts in their literal meaning."

The editor of A. L. R., in the aforementioned volume, states the results of his examination of the decisions, thus:

"While the decision in each case depends largely on its particular facts and the wording of the contract of insurance, it may be stated as a general rule, from an examination of all the cases on the subject, that the provisions of a health or accident insurance policy requiring the insured to be confined to the house do not have to be literally complied with in order to entitle the insured to his indemnity."

■ Our examination of the authorities convinces us that confinement within the four walls of one's home every moment of the period for which indemnity is sought is unnecessary. Before a recovery can be had under a clause similar to that under consideration, the insured must be afflicted with an illness which men commonly regard as a confining illness. When the illness is sufficiently severe to confine the insured to his home for substantially all of the time, an occasional excursion outside to secure medical attention or to secure the healing effect of sunshine will not defeat

recovery. We take the precaution to add that mere loss of income without necessary confinement will not suffice. Malingering cannot augment the amount of recovery, and trips to one's place of business for business purposes is evidence that the insured is no longer confined indoors. The trips outdoors must be taken for the exclusive purpose of facilitating recovery.

The above being our views, it follows that the assignments of error disclose no error.

■ Based upon the provisions of section 46-134, Oregon Code 1930, the plaintiff moves for the allowance of an attorney's fee as compensation for the services of his attorney in this court. Such an allowance is permissible: *Spicer v. Benefit Ass'n of Ry. Employees,* 142 Or. 574 (17 P. (2d) 1107, 21 P. (2d) 187). The circuit court allowed the plaintiff $500 with which to compensate his attorney for services rendered in that court. The cause has been twice before us: *Purcell v. Wash. Fed. Nat. Ins. Co.,* 141 Or. 98 (16 P. (2d) 639). The judgment should include an allowance of $500 as compensation for plaintiff's attorney in this court.

RAND, C. J., BELT and KELLY, JJ., concur.