**WATERMAN STEAMSHIP CORPORATION, Libelant,**

v.

**Marjorie M. SNOW and Fern Wilson, Executrices of the Last Will and Testament of Claude M. Snow, Deceased, D/B/A Snow Insecticide Company, Respondents.**

**Marjorie M. SNOW and Fern Wilson, Executrices of the Last Will and Testament of Claude M. Snow, Deceased, D/B/A Snow Insecticide Company, Petitioners,**

v.

**GENERAL ACCIDENT FIRE AND LIFE ASSURANCE CORPORATION, Ltd., a corporation, Impleaded Respondent.**

Civ. No. 62–153.

United States District Court
D. Oregon.
Sept. 27, 1963.

Garry P. McMurry, of Krause, Lindsay & Nahstoll, Portland, Or., for libelant.

William F. White, of White, Sutherland & White, Portland, Or., for respondents and petitioners.

Kenneth E. Roberts, of Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for impleaded respondent.

KILKENNY, District Judge.

This is an action over by petitioners against impleaded respondent on an insurance policy under which petitioners claim that impleaded respondent is liable for payment of the Judgment entered against respondent in the original libel.

In the original proceeding the Court found that Claude M. Snow, then living, was on the 24th day of September, 1960, engaged in the business of fumigating, spraying and applying insecticides and fumigants aboard vessels under the assumed business name of Snow Insecticide Company. On said day the libelant and Snow entered into a contract under which Snow agreed to spray, with an insecticide, number three hold and the number four deep tanks in a certain vessel, preparatory to loading bulk grain in those holds, under which contract Snow owed Waterman an implied in fact obligation to perform his work in a safe and workmanlike manner, and under which he impliedly warranted that his work would be done in accordance with this standard. On said day, Snow sprayed said hold and deep tanks. On the conclusion of the work Snow's employees left the

vessel. In spraying the number three hold, Snow applied an insecticide of pure lindane mixed with kerosene, a formula capable of having a toxic and hazardous effect on human health. On that evening certain longshoremen went aboard the vessel to load grain and noticed an unusually strong, bitter and obnoxious odor emanating from hold number three and later one Theodore Meier, a longshoreman, between 1:30 A.M. and 2:00 A.M. on September 26th, with his partner, entered hold number three to line up a grain pan so that the wheat could be loaded into various corners of said hold. While performing this work Meier was exposed to and inhaled such noxious fumes and became nauseated and dizzy from contact with the same, as a consequence of which he became very ill. I there found the above facts and the further fact that Meier's illness was proximately caused by the noxious fumes in said hold, which in turn was caused by Snow's spraying operation. My finding was that the dangerous condition was caused by an overapplication or by an overconcentration of the particular spray prepared and used by Snow. I further found that Snow breached his warranty of workmanlike service and was negligent in the following particulars: (a) In using an excessive and unreasonable concentration of spray; (b) in using the spray in an excessive and unreasonable amount; and (c) in failing to warn longshoremen and Meier, in particular, of the dangers incident to entering said hold, in that, as he knew or should have known of such dangers. I further found that the vessel was unseaworthy as the result of said concentration of the noxious and dangerous fumes in such hold in which Meier was working. Additionally, I found that Snow had breached his obligation of workmanlike service and was negligent in expressly authorizing the use of the number three hold, in which the toxic spray had been applied, when he knew, or by the exercise of reasonable diligence should have known of the unsafe condition thereof following the excessive and unreasonable application of said spray.

Before entering the hold Meier had been in good health and had a normal voice. As a result of being exposed to said odors and fumes Meier sustained injury and damage to his throat and larynx which I found was of a permanent nature. Such injuries were proximately caused by Snow's breaches of workmanlike service and his negligent acts. Furthermore, I found that Waterman was not guilty of any contact which was the proximate cause of any of the injuries and that the unseaworthiness of the vessel was caused by the improper conduct of Snow. Subsequent to his injury Meier commenced an action in a court of general jurisdiction in the State of Oregon in which action Waterman tendered the defense to Snow. Snow refused to defend the action. After securing the benefit of medical reports and after depositions had been taken, Waterman effected a settlement of that cause for the sum of $7,500.00. Prior to the settlement Waterman notified Snow of its negotiations and the settlement proposal, but Snow refused to consent or contribute to the settlement. In April, 1962, Waterman paid the sum of $7,500.00 to Meier in full compromise and settlement of that claim. It was my finding that Waterman was faced with a serious personal injury action in said Court, that the settlement of the action was fully justified and that the settlement in the sum of $7,500.00 paid to Meier by Waterman was a reasonable settlement under all of the facts and circumstances of the case. Further, that in defending such action and in negotiating and concluding the settlement that Waterman incurred expenses and attorney fees in the sum of $2,706.80, which was a reasonable sum and was necessarily incurred. Based on said findings, I concluded that Waterman was entitled to a decree against Snow for the sum of $10,206.87 with interest at the rate of 6% per annum from April 4, 1962, and on May 2, 1963, signed a decree awarding Waterman a judgment against Snow for said sum and interest, together with costs in the sum of $124.44. In such decree, I

retained jurisdiction for the purpose of deciding the issues here presented between Snow, the petitioner, and the impleaded respondent.

The insurance policy issued by General to Snow is designated in capital letters, COMBINED COMPREHENSIVE LIABILITY POLICY, and specifically covers automobile and other liability for personal injury. GENERAL fully understood the nature of Snow's business and that type of business is expressly indicated in the policy. The parties are in agreement that the policy would cover the bodily injury damage to Meier, unless that coverage is excluded by the Products Hazard endorsement [1] to the policy. The phrase "Products Hazard" is defined in the policy as follows:

"*Products Hazard.* The term "products hazard" means

(1) goods or products manufactured, sold, handled or distributed by the named insured or by other trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division (a) of the declarations excludes any part of the foregoing; provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;

(2) operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further, the following shall not be deemed to be "operations" within the meaning of this paragraph: (a) pickup or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in division (a) of the declarations specifically includes completed operations."

Waterman's longshoremen, including Meier, came aboard the vessel between 6:30 and 7:00 P.M. and at that time found the odors in hold number three so strong and obnoxious that they would not work in the hold without a certificate being furnished by Snow that the hold was safe. Snow furnished that certificate about 11:00 P.M. on that evening. The spraying had been completed approximately fourteen hours before Meier

---

1. "ENDORSEMENT END. #10

NOT VALID UNLESS SIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE COMPANY

EXCLUSION OF PRODUCTS HAZARD

It is agreed that the policy does not apply to the *products hazard as defined therein.*

This endorsement is subject to all the agreements, conditions, and exclusions of the policy unless such agreements, conditions and exclusions are expressly modified or expressly eliminated hereby.

This endorsement forms a part of Policy No. CG 346150 issued to SNOW INSECTICIDE CO., and CLAUDE M. SNOW, INDIVIDUALLY by GENERAL ACCIDENT FIRE AND LIFE ASSURANCE CORPORATION, LIMITED, or POTOMAC INSURANCE COMPANY, or by both said Companies as the interest of either or both appears in the above mentioned policy and is effective from 4/1/60 (Standard Time as stated in the Policy) Date and place of issue 6/10/60, PORTLAND, OREGON
* * *"

and his partner descended into the hold and that the vessel's blowers had been turned on in the hold for the purpose of clearing the air some four hours before the entry of said men. Consequently, we have a case where the assured had actually completed his operation many hours before the particular accident, but the over-application or over-concentration of the spray caused the noxious fumes to permeate the air so that Meier was injured many hours after completion of the spraying operation.

At the time of the arguments the petitioners abandoned any claim to a reformation of the insurance policy and at the same time expressly abandoned any claim of estoppel or waiver. The principal trust of the petitioners' claim is that the insurance policy and the exclusion, when read as a whole, is ambiguous, should be construed against the insurance company, and, when so construed, creates liability on the insurance company for the judgment in question.

■■ Without doubt, the language of the policy must be liberally construed in favor of the assured. Kaifer v. Georgia Casualty Co., 67 F.2d 309 (9 Cir. 1933); Yoshida v. Security Insurance Co. of New Haven, Conn., 145 Or. 325, 26 P.2d 1082; Roberts v. Union Insurance Society of Canton, 215 Or. 183, 332 P.2d 600. Where there is an ambiguity in the language of the insurance contract it is to be construed most strongly against the insurer. Zurich Insurance Co. v. Sigourney, 278 F.2d 826 (9 Cir. 1960); Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895.

The rule that language in an insurance policy should be liberally construed in favor of the insured must be considered in the light of other rules of construction and in particular in the light of the rule that such contract should be construed so as to ascertain and declare the true intention of the parties. I-L Logging Co. v. Manufacturers & Wholesalers Indemnity Exchange, 202 Or. 277, 273 P.2d 212, 275 P.2d 226.

■ The rule of strict construction against an insurer, is particularly applicable to an exclusion clause. I-L Logging Co. v. Manufacturers & Wholesalers Indemnity Exchange, supra.

■ On the other hand, an unambiguous insurance policy must be enforced, like any other contract according to its terms. Bradley v. Prudential Insurance Co. of America, 70 F.2d 988 (9 Cir. 1934). If the language of the exclusion clause is plain and unambiguous the clause must be given full force and effect. Clark Motor Co. v. United Pacific Insurance Co., 172 Or. 145, 139 P.2d 570. The Court will ordinarily place on words of an insurance policy their primary and general meaning. Purcell v. Washington Fidelity National Insurance Co., 146 Or. 475, 30 P.2d 742. It is my duty to construe and enforce the insurance contract as the parties have seen fit to make it and I have no right or authority to make a new contract. Smith v. Germania Fire Insurance Co. of New York, 102 Or. 569, 202 P. 1088. However, where the word or phrase is defined in the contract, such definition is binding on the Court. Bunnell v. Parelius, 166 Or. 174, 111 P.2d 88; State Industrial Accident Commission v. Eggiman, 172 Or. 19, 139 P.2d 565. Although these cases involve statutory definitions, there is no reason why the same rule should not apply to definitions of a contractual nature.

Although petitioners complain of the bulk of the written material in the policy, there is no positive claim of ambiguity in any part of the policy, other than the exclusion clause on products hazard. Petitioners argument is along the line that it would be very difficult for the assured, in view of the bulk, to find the particular exclusion and then search out the meaning of "Products Hazard" where it is defined in the policy. First, of all, I found no difficulty in locating the definition in the printed portion of the policy, and, second, even if the argument was sound, it would point to a difficulty in locating the definition, rather than an ambiguity in the exclusion or in the definition itself.

At times, it is rather difficult to follow petitioners argument. In places, considerable stress is placed on the letter of transmittal which enclosed the policy to Snow, in which the exclusion was not mentioned. If petitioners were seeking a reformation or if the exclusion was, in fact, ambiguous, the letter might have some evidentiary value. If, however, the policy including the exclusion, is unambiguous, and there being no claim to reformation, then there is no room for a consideration of the contents of the letter. There is no claim that Snow could not read or write.

Turning to the language of the exclusion endorsement. Certainly, the parties intended to exclude something and a casual reading of the endorsement would convince anyone with the slightest familiarity with the English language that the endorsement intended to exclude from the coverage of the policy "products hazard" as defined in the policy. The exclusion is in clear, concise and understandable language. Manifestly, there is nothing ambiguous, uncertain or indefinite about the language or the provisions of the endorsement. However, for a proper analysis and study of the contentions it becomes necessary to turn to the policy definition of "products hazard". There we find under subdivision (1) that goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, are included within the definition of "products hazard", as excluded by the policy. We are concerned with this part of the definition only insofar as it indicates the exclusion of the goods and products therein mentioned, here the insecticide sold and used.

More important, is the "products hazard" definition which excludes "operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises, rented or controlled by the named insured; *provided, operations shall not be deemed incomplete because improperly or defectively performed.* * * *"
(Emphasis supplied)

A well known author [2] reminds us that products liability insurance is becoming increasingly important with the passage of time, in view of the ever present potentialities for injury resulting from chemicals, drugs, explosives and other products possessing inherent hazards. The author states, among other things:

\* \* \* \* \* \*

"It is apparent that liability under what we ordinarily term 'public liability' coverages can arise fundamentally in three distinct ways. An injury or a loss may result while an activity is in progress, and prior to the completion thereof, either as the result of an act of negligence or an omission. That is what is embraced within the ordinary liability aspect of a public liability policy. But if the operation has been completed, and liability results thereafter either by reason of a defect in merchandise or improper workmanship, that is called 'products liability' or 'completed operations', the protection of which can be purchased for a premium. Neither type of coverage is intended to supplant the other, nor would the premiums charged be adequate for that purpose. \* \* \*"

\* \* \* \* \* \*

"Operation" is generally understood as the doing of some act or the performance of some type of service, such as operating a business, an automobile, a service station or for that matter an insecticide business. Webster defines an "operation": "a doing or performing action; work, a deed; production; creation; also, a product of work \* \* \*", and an "operator" is defined: "In general, one who or that which operates; as: (a) one who produces an effect or does something; one who does appropriate practical operations, as in business, art, or science; one whose work is to operate a specified thing." The word has been so judicially defined. Layman v. State

2. Appleman, Insurance, 7A § 4508.

**898**

Unemployment Compensation Commission, 167 Or. 379, 117 P.2d 974; New York, S. & W. R. Co. v. United States (D.C.N.J.) 200 F.Supp. 860, 864; Central Accident Insurance Co. v. Rembe, 220 Ill. 151, 77 N.E. 123, 126, 5 L.R.A.,N.S., 933.

■ The word "ambiguous" is defined as meaning "capable of being understood in either two or more possible senses; equivocal; * * *" Webster's New International Dictionary of the English Language, Second Edition; Whiting Stoker Co. v. Chicago Stoker Corp., 171 F.2d 248, 250 (7 Cir. 1948). The language defining "products hazard", without straining the meaning of common English to its breaking point, is incapable of being understood in more than one sense. The language of subdivision (1) concerns itself with "goods or products manufactured, sold, handled or distributed by the named insured." Subdivision (2) concerns itself solely with operations, as distinguished from the goods or products themselves as covered or encompassed by subdivision (1). "Operations" as defined in the policy, means absolutely nothing, if it does not cover the operations or services being performed by Snow in the preparation and application of the insecticide. There is no doubt that Snow had finished his job, as he understood it, many hours before the accident and his last act in connection with the job, although he was not in the hold at the time, was about 11:00 P.M. when he signed the certificate that the hold was safe. True enough, the dangerous fumes from the application of the insecticide continued to rise and contaminate the air in the hold to the time when Meier inhaled sufficient to cause his injury. Can it be said that the presence of or continuation of the dangerous fumes prevented a *completion* of the operation? Under ordinary circumstances that might be answered in the affirmative. But be that as it may, the Scrivener in drafting the insurance contract, evidently anticipated the precise problem and inserted the language "provided, operations shall not be deemed incomplete because im-

properly or defectively performed or because further operations shall be required pursuant to an agreement". I have held that the original application was improperly and defectively performed. Therefore, it seems crystal clear that "operations", such as conducted by Snow, were specifically excluded from coverage under the "products hazard" exclusion endorsement. The operation was completed many hours prior to the occurrence in which Meier sustained his injury and which was the basis of the judgment here in dispute.

It is my finding of fact and conclusion of law that coverage was not afforded the petitioners, on the primary operation, by the insurance policy in question. The particular coverage was specifically excluded by the said endorsement excluding "products hazard".

My finding and conclusion finds adequate support in Tidewater Associated Oil Co. v. Northwest Casualty Co., 264 F.2d 879 (9 Cir. 1959). The language of exclusion in the Tidewater case is essentially the same as the language of the endorsements before me. Certainly, that is true of the language of the exclusion in Tidewater which encompassed the field of operations, which read: " * * * or if caused by operations if the accident occurs after such operations have been completed or abandoned at the place of occurrence (other than pick up and delivery, and the existence of tools, * *; provided, *operations shall not be deemed incomplete because improperly or defectively performed * * *.*" The Court there held that the acts of the truck driver in negligently filling the oil can with gasoline and delivering it to the injured person were "operations" as that word was used in the endorsement. Attention is called to the fact that the accident occurred after these "operations" had been completed and that it was thus expressly excluded from coverage under the emphasized language of the exclusion agreement. There, the injured person attempted to use the gasoline in an oil stove and was injured as a result of the explosion. Petitioners argument that

Tidewater is to be distinguished on the ground that sale of a product was involved in that case and that the sale of a product is not here involved is without merit. Here, Snow sold his specially mixed insecticide just as surely as he sold his service. The sale of the product and of the service was one and the same transaction. Tidewater cannot be distinguished. The later Ninth Circuit case of Bitts, et al., v. General Accident Fire and Life Assurance Corporation, 282 F.2d 542 (9 Cir. 1960), while not exactly in point, deals with a similar problem and points to non-liability. Other cases supporting my views are Berger Bros. Electric Motors, Inc. v. New Amsterdam Casualty Co., 293 N.Y. 523, 58 N.E.2d 717, 156 A.L.R. 1281; New Amsterdam Casualty Co. v. Ellzey, 240 F.2d 618 (5 Cir. 1957).

Petitioners contention that the policy is ambiguous, and, that the coverage is not excluded by the endorsement, is based on a line of cases headed by McNally v. American States Insurance Co., 308 F.2d 438 (6 Cir. 1962). It is true that the exclusion in McNally was practically identical with the exclusion before me. Be that as it may, the decision was by a divided Court, with the dissenting Judge flatly stating that he was unable to follow the reasoning of the Court with reference to the provisions of the exclusion on "completed operations". The majority opinion arrived at the conclusion that there was a direct conflict between the language of the exclusion with reference to products and the language dealing with operations and that the alleged conflict created an ambiguity. The Court construed the policy as covering a failure to properly inspect and maintain the elevator after the repair and inspection had been completed. The dissenting Judge could find no conflict between the two provisions, nor can I. Manifestly, one paragraph treats of an exclusion as to products, as such, and the other paragraphs treat of an exclusion of operations when completed. The majority opinion recognizes that there is a conflict of authority on the subject.

The language of the exclusion in Boswell v. Travelers Indemnity Co., 38 N.J. Super. 599, 120 A.2d 250, bears no similarity to the language of the exclusion here being considered. It is not difficult to agree with the New Jersey Court that the language of the exclusion in the Boswell case is ambiguous. Obviously, the exclusion in Hercules Co. v. Royalty Indemnity Co., D.C., 171 F.Supp. 746, did not contain language of similar import to the present exclusion. The Court in Hercules distinguished between the sale of products and the performance of services and emphasizes that the exclusion of products liability would not inform the average purchaser that there had been an exclusion of liability for services performed in connection with the use of the products. This was a proper conclusion for the Court, in view of the language of the policy and the language of the exclusion. In the present case, however, the exclusion directs the policyholder to a *specific* definition of "products hazard". If the insured had read the definition, he would have known that operations, including services performed in connection with use of the products, was excluded.

The Louisiana Supreme Court had a similar exclusion endorsement before it in Kendrick v. Mason, 1958, 234 La. 271, 99 So.2d 108, in which it held that the two paragraphs of the exclusion, when read together, created an ambiguity and that there was coverage under a comprehensive liability insurance policy, for negligence in the installation of a sewage system which permitted the escape of gas after the job had been completed and accepted. It seems to me that the Louisiana Court in Kendrick stretched the rules of construction against an insurance company to the breaking point and that, in fact, the Court brushed aside the express language of the policy and thus created a new contract between the parties. Entirely overlooked was the rule that an insurer may insert as many exemption clauses in its policy as it sees fit and that the Courts cannot change the terms thereof by judicial construction,

even in the case of exemptions from liability, if such exemptions are free from uncertainty as to meaning. Clark Motor Co. v. United Pacific Insurance Co., 172 Or. 145, 139 P.2d 570. The obvious purpose of an exclusion clause is to limit the liability of the insurer and the provisions thereof, and if plain and unambiguous, must be given force and effect. Beyond question, it is within the province of the insurer to decide what coverage it will accept and what coverage it will reject. The fact that the exclusion clause may greatly limit the liability of the insurer does not affect the legality of the exclusion. Although the opinion in Kendrick treats of ambiguity and the resulting construction against the insurance company, the ultimate holding was that the exclusion provisions were inapplicable for the reason that the insured *handled no products,* but was engaged solely as a contractor in the performance of services and that the exclusion provision of the policy had no application to such a contract. That cannot be said of the present problem. Here, Snow was using his own product, the insecticide. Swillie v. General Motors Corporation, La.App., 133 So.2d 813, is a case which follows the rule adopted by the same Court in Kendrick. The Court there recognizes a wide division of authority on the subject.

In my view, the Ninth Circuit is committed to the view that exclusion provisions similar to those here in question do not create an ambiguity, that the policy in question affords no coverage to the petitioners on the initial operation.

 My discussion and findings, thus far, do not touch on the problem created by the negligent representation made by Snow a considerable time after his men left the job and the operation was complete. In the primary suit, I found, and, I again find, that some hours after Snow's workmen left the job and the operation was complete, the longshoremen, including Meier, would not enter the contaminated hold without a written statement from Snow that the hold was safe for human occupancy. Snow signed such a statement, and thus negligently misrepresented the safety of the hold and expressly invited the use of the same by the injured man. Under the authorities previously cited the comprehensive liability insurance policy would cover this type of liability, unless it was expressly excluded.

Already, I have held that this was a negligent act, that Meier relied on the representation and was injured thereby. Although the original operation had been completed, it seems to me, and I hold, that this act, resulting in Meier's injuries, was a new operation, separate, complete and distinct from the original operation.

Strictly construing the exclusion, which I must, I can find no room for excluding from the general coverage such a negligent representation. This conclusion finds complete support in Reed Roller Bit Co. v. Pacific Employers Ins. Co., 198 F.2d 1 (5 Cir. 1952). Oregon follows the rule of strict construction against an insurance company in the interpretation of insurance policies, and, in particular, the interpretation of a clause which excludes certain liability from the coverage of the policy. I-L Logging Co. v. Manufacturers & Wholesale Indemnity Exchange, supra. To include this act, within the exclusion, would stultify that rule of strict construction. Neither the language of the policy, nor the definition of "products hazard" requires, or persuasively suggests, that this negligent action of Snow's was intended to be excluded from coverage. I firmly believe that the Oregon Supreme Court, if faced with the precise problem, would hold that injury resulting from the negligent representation on the part of Snow was covered. My findings, both of law and of fact, on this last issue are in favor of petitioners.

It follows that petitioners are entitled to judgment against impleaded respondent for the sum of $10,206.87, with interest thereon at the rate of 6% per annum from April 4, 1962, until paid, and the further sum of $124.44, together with interest thereon at the rate of 6% per annum from May 2, 1963, until paid, and

the further sum of $1,500.00 as attorney fees.

Reference is made to the agreed statement of facts as incorporated in the Pre-Trial Order and the stipulations of the parties at the time of trial, all of which are incorporated herein as part of this opinion which shall stand as my Findings and Conclusions.

Judgment shall be entered accordingly.