WILLIAM POLICH, Claimant, Appellee, v. ANDERSON-ROBINSON COAL COMPANY et al., Defendants, Appellants.

No. 44832.

Huebner & Huebner and T. E. Andresen, for appellants.

Mabry & Mabry, for appellee.

MILLER, J.—This is a proceeding under the Workmen's Compensation Act, Code 1935, section 1361 et seq. The only issue presented by the proceedings concerns the rate of compensation to be paid. There is no disputed question of fact in the record and, accordingly, merely a question of law is presented.

The claimant received an injury arising out of and in the course of his employment on November 20, 1936. Thereafter, a memorandum of agreement was executed by the claimant and the employer's insurance carrier, which provided that the disability had not been determined, that the daily wage was $5.20, that the basis for compensation was the 200-day rule, and that, under such rule, the rate of compensation was $12 per week. This memorandum was filed with the industrial commissioner on March 16, 1937. It was neither approved nor disapproved by the commissioner and, pursuant to the provisions of section 1436 of the Code, automatically stood approved 20 days after it was filed. Pursuant to this memorandum of agreement, the defendants paid compensation for 18 weeks at the agreed rate of $12 per week, totalling $216.

On July 16, 1937, the claimant filed a petition for arbitration, alleging that the parties had failed to reach an agreement and praying for the formation of a board of arbitration pursuant to the provisions of section 1437 of the Code. Defendants filed a motion to dismiss or to strike the petition for arbitration, asserting that the memorandum of agreement, having been filed and having become approved by operation of law, the industrial commissioner was without jurisdiction to entertain the application for arbitration, and that claimant's

only remedy is determined by section 1457, providing for review of an agreement for settlement.

The commissioner sustained the contentions of the defendants but permitted claimant to recast his application for relief by substituting a petition for review. Thereafter, claimant filed his application to reopen, asserting that the memorandum of settlement, filed March 16, 1937, was incomplete, did not comply with the Workmen's Compensation Law, and was incorrect as to the basis for computing compensation. Defendant's answer to this application admitted claimant's injury of November 20, 1936, asserted the memorandum of settlement, the payment of 18 weeks' compensation at the rate of $12 per week, totalling $216, a tender of 10¾ additional weeks, totalling $129, the payment of statutory medical, surgical and hospital services, that the payments and tender fully compensated claimant, that the rate of compensation provided by the settlement was correctly computed, because claimant was employed in a business or enterprise which customarily shuts down and ceases operation during a season of each year and the number of working days which it is the custom of such business or enterprise to operate is less than 200 days each year, so that claimant's compensation was and is properly computed on a 200-day basis.

Thereafter, the parties filed with the commissioner a written stipulation whereby it was agreed that claimant received a permanent partial disability to his left index finger, which would entitle him to 28¾ weeks' compensation; that he had been paid 18 weeks' at $12 per week, totalling $216, had been tendered 10¾ additional weeks at $12 per week, totalling $129, which tender had been declined, that claimant's daily wage was $5.20 per day, that the rate of compensation of $12 was computed under the 200-day rule, and that the sole and only issue involved in the proceeding was what subdivision of section 1397 of the Code should be used in computing the compensation rate.

Hearing was had before the industrial commissioner. At the outset, the commissioner held that the 300-day rule for computing compensation, pursuant to subparagraph 3 of section 1397 of the Code, is a primary and general rule, that the 200-day rule, provided for by subparagraph 6 of said section, is an exception and in the nature of a special defense, and for

that reason the burden of proof rested upon the defendants to prove their defense. Defendants excepted to this ruling of the commissioner, but, by the very nature of the situation, were forced to assume the burden of going forward with the evidence.

Defendants' testimony showed that the defendant is a corporation, which was organized in 1934 and operates a small local or wagon mine, located near Melcher, Iowa. In May, 1934, the construction of the shaft was commenced. Production of coal started the last of August, 1934. From that time until the date of claimant's injury, it was the custom of this mine to shut down and cease the production of coal between the middle of April and the forepart of September of each year. Mr. Burke, the bookkeeper, testified that, in 1935, it ceased the hoisting of coal between April 15th and September 1st; that the same was true in 1936. Mr. William Robinson, the principal stockholder, testified:

"It has been our custom to start production of coal approximately the first of September and to cease production of coal approximately the middle part of April each year. That has been our custom ever since the mine was sunk and on up to the time of this injury. During these cessations in the hoisting and production of coal none of the rooms in the mine were worked and no men were working in the mine in the capacity of miners and during these cessations no entries were advanced or coal produced in or hoisted from this mine."

The claimant sought to meet the effect of defendant's testimony in several ways. One contention was that the defendant company had a sales company known as the Robinson Coal Company, which took substantially the entire output of the mine, and that its operations should be considered with those of the defendant company. Various claims of fraud are asserted, which are not supported by the evidence, and, as a matter of fact, there is no showing that the Robinson Coal Company sold any coal during the time that the defendant coal company ceased hoisting coal. Claimant also relies upon the fact that, while the mine was shut down so far as hoisting the coal is concerned, certain other work was done. Whereas the work of constructing the mine was commenced in May, 1934, the articles

of incorporation were not filed until August 6, 1934. The work of hoisting the coal commenced in August, 1934, and continued until the early days in April, 1935, when the company ceased hoisting coal and did not renew such operations until August, 1935. Very little repair work was done during the summer of 1935, but the company did construct an air shaft and operated a water pump about two or three times a week during that summer. In the early part of April, 1936, the company again ceased the hoisting of coal and did not renew this operation until August 21, 1936. During that summer, a period of eleven days was consumed in placing supports in the air course, removing some rails that had been used as a track, and placing them in an entryway for safekeeping. The water was also pumped out, which was accomplished by pushing a switch located at the surface close to the hoisting shaft, which caused the pump to operate by electric power. This was performed two or three days per week. The ponies or mules used for hauling mine cars were placed in pasture. The men employed for the mining of coal took their tools home.

The statute involved herein is subparagraph 6 of section 1397 of the Code, which provides as follows:

"6. For employees in a business or enterprise which customarily shuts down and ceases operation during a season of each year, the number of working days which it is the custom of such business or enterprise to operate each year instead of three hundred shall be the basis for computing the annual earnings; but the minimum number of days which shall be used as a basis for the year's work shall not be less than two hundred."

In construing the statute, the commissioner states:

"We are therefore constrained to hold that the word 'operation' means more than actual production when considered in connection with the context of paragraph 6, section 1397, and includes any ordinary or usual matters and things had and done in connection with and as a part of the business or enterprise, reasonably necessary for the successful conducting of the business or enterprise, but not including that which may be reasonably regarded in the way of care-taking of the business or enterprise during and for the shut down season. * * *

"If the statute provided 'customarily cease production' it could be said that 'cease hoisting coal' was shutting down and ceasing 'operation' within the legislative intent, but the statute requires more than shutting down production. It must be shutting down and ceasing business and matters incident thereto. Thus since activities of a business or enterprise means 'operation' within the meaning of the law, it follows that all of the activities of the business or enterprise, except care-taking, must shut down and cease for a season of each year to entitle the employer to claim the benefits of paragraph 6 of said section and in addition thereto such course of procedure must be for such number of years to establish the same as a custom."

In determining what was necessary to establish a custom, the commissioner held that the word "customary" refers to a trade custom such as would constitute a derogation of the general rules of law, that such custom must have been used so long that the memory of man runneth not to the contrary or an analogous period, must be continuous, reasonable and certain. The commissioner held that the defendant's business did not shut down and cease operation for a season in 1934 or 1935, that it *did* shut down and cease operation for a season in 1936, but this was insufficient to establish the required custom within the meaning of the law, and, accordingly, claimant's weekly compensation should be computed in accordance with subparagraph 3 of section 1397 of the Code. This computation produced the maximum rate of $15 per week. The total compensation found to be due claimant at such rate for 28¾ weeks amounted to $431.25. Since he had been paid $216, this left a balance of $215.25, which was awarded to claimant together with 6 per cent interest from October 19, 1937, the date of filing the petition for reopening proceedings. Exception was allowed in favor of both parties.

Both parties appealed to the district court pursuant to the provisions of section 1449 of the Code, the grounds stated in each instance being based upon the provisions of section 1453 of the Code. The district court construed subparagraph 6 of section 1397 of the Code, as follows:

"As a legal proposition, I am of the opinion that two things are necessary in order to bring a certain employer and em-

ployee under paragraph (6) ; it must be established that the unit in question is one that does seasonally shut down and cease operation, and, it must establish that the general industry or business, of which it is a unit, is so recognized as a seasonal one. If this be established, then paragraph (6) is applicable.
\* \* \*

"I cannot agree with the Commissioner in his fact question under the undisputed record in this case. In my judgment the mine in question was shut down and did cease to operate during the years of 1934, 1935, and 1936. The record shows that the particular unit in question did operate as a seasonal one and, if the record shows that the industry or business in general, to which it belonged, was a seasonal one, then it comes within the provisions of paragraph (6).

"The record in this case, however, is silent as to the custom of the coal mining industry in the number of days that it operates. If, in the locality in question, two types of mines exist, that is railroad and wagon mines, and if entirely different customs exist in the industry as between these two classes of mines, then a classification of these groups must be shown wherein the classification to which the unit in question belongs, is that of a seasonal business or industry, or that the entire industry of mining coal must be shown to be seasonal before the paragraph (6) would apply even though the particular unit in question may have shown that it was seasonal.

"The record being silent as to the custom of operation of the coal mining industry, either as a whole, or on a basis of a wagon mine, as distinguished from a railroad mine, in my judgment there is not such a showing of a seasonal business as to place in operation the provisions of paragraph (6). Under the particular record the three hundred day rule and not two hundred is proper."

From the judgment of the district court, both parties have appealed to this court.

It will be noted that, whereas the industrial commissioner and the district court reached the same result, they did so by distinctly different routes. The commissioner held that, in determining whether or not a claimant is employed in a "business or enterprise which customarily shuts down and ceases operation during a season of the year" so as to come within the limita-

tion of subparagraph 6 of section 1397, the words "customarily shuts down and ceases operation" are to be applied to the business of the claimant's employer, without regard to other employers engaged in similar activity. With the rule so limited, the commissioner found that the appellant employer did not conduct its business within the contemplation of the statute. The district court, on the other hand, found that, if the statute is to be applied to the business of appellant employer, without regard to the other employers engaged in similar activity, appellant came within the contemplation of the rule. However, the district court concluded that the failure to show the methods employed by other employers engaged in like activity rendered the evidence fatally defective.

We are of the opinion that the commissioner was right in his holding that the applicability of the statute is to be determined from the nature of the business conducted by the claimant's employer, without regard to the operations of other employers engaged in like activity, and that the district court was in error when it held otherwise. We are also of the opinion that the district court was right in holding that the particular unit operated by appellant employer did operate as a seasonal one and came within the provisions of the statute and that the industrial commissioner was in error in holding otherwise. Accordingly, the result which we reach is the opposite of that reached by the commissioner and the district court.

From the briefs and arguments of counsel and from our own investigation, it appears that there are only two decisions of this court which have construed this statute. One is Richards v. Central Iowa Fuel Co., 184 Iowa 1378, 166 N. W. 1059, and the other is Forbes v. Ottumwa Sand Co., 216 Iowa 292, 249 N. W. 399. It is also significant that the statute was amended between the date that Richards was injured and the date that Forbes received his injury. Accordingly, the Richards case construes the statute as it originally read, whereas the Forbes case construes the statute as it now reads.

At the time that this court decided the Richards case, the statute read as follows:

"As to employes in employments in which it is the custom to operate for a part of the whole number of working days in each year, such number shall be used instead of three hundred

as a basis for computing the annual earnings.'' [184 Iowa 1378, 166 N. W. 1060.]

In applying said statute to the record in that case, this court states as follows:

''The parties stipulated that the records in the office of the state mine inspector show the average number of days mines were operated in the territory involved is 220 days. It is recited in the findings of the arbitration board and of the industrial commissioner that there was also an oral agreement on the hearing that what these records in the office of the state mine inspector show was the fact. Whatever, then, may be the rule where there is no such proof or oral agreement, in the case before us the computation must be worked out by creating a dividend out of multiplying the average daily earnings by 220, instead of by 300. We do not think that this conclusion is avoided by the argument of appellant that the statute last referred to deals only with seasonable employment, such as canning; and that, although coal is hoisted out of a mine for only 220 days in a year, it is operated for more days than that, because there is always someone at work in a mine. The business of the mine is to send coal to the surface for transportation and sale. If, according to custom, *such operation* is conducted for less than 300 days in the year, operation is still limited by custom to the lesser number of days, even though, on all the days of the year, there is, say, a caretaker in the mine. We conclude that, up to this point, the computation in this case is to be made by multiplying the average daily earnings for the year preceding the injury by 220, and then dividing by 104.''

It will be noted that the statute, construed by us in the Richards case, applied to *employments generally* in which ''it is the custom to operate for a part of the whole number of working days in each year'' and, in computing compensation, ''such number shall be used instead of 300 as the basis for computing the annual earnings'' without any minimum limitation. Accordingly, in the Richards case, it was necessary to, and the record did, show that the average number of days mines were operated in the territory in which the employer operated was 220 days, and this was used as the basis for computing the compensation. It will also be noted that this court expressly recog-

nized that the number of days in which coal is hoisted was the basis for determining the number of days that the mines operated, even though it might also appear that there was always someone at work in the mine.

In the Forbes case, the claimant was injured while engaged in harvesting ice for the Ottumwa Sand Company, which company also operated a sand and gravel business. There was no reference in the record to the number of days that it was customary for employers, generally engaged in harvesting ice, to operate. The record was confined to the operations of the *particular* employer, and this court recognized that the change of the statute, from the wording construed in the Richards case to the wording in the statute now before us, limited the scope of inquiry to the operations of the particular employer. In holding that the limitations of the statute were not applicable, because the operations of the particular employer did not come within the contemplation of the statute, this court states [216 Iowa 292, 294, 249 N. W. 400]:

"It appears for the defendant that the dredging operations must necessarily stop about the 1st of December, when freezing weather sets in and renders the use of the dredge impracticable. Conversely the ice harvest cannot be gathered in the summer time. It must wait for the winter to mature its crop. The ice cutting season lasts for an average of 11 days in the winter time. The ice is all shipped to the customers as fast as it is gathered. The defendant operates no icehouse. It sells its ice in advance and then fills its orders. It is undeniably true that there is a part of every winter when the defendant neither dredges sand nor gathers ice. The fact remains under the evidence that the plant does not shut down at any season. It is in continuous operation from one end of the year to the other. Collecting sand and gravel from the river banks by the use of dredges comprises only a part of the sand and gravel business. The marketing and delivering of the stocks of sand constitute a vital and continuous part of the enterprise. It is true that the company operated in the winter time with a much reduced force. Its employees in the winter time were few except in connection with the ice harvest. The decedent, William Forbes, was not one of the employees whose employment was continued throughout the winter. It is upon this fact that the defendant bases

its claim that the employment of Forbes was seasonal and that it did not exceed 200 days in the year. But the period of plaintiff's employment is not the criterion laid down in the statute. This exceptional provision of the statute above quoted is made applicable only in a case where the enterprise *itself* 'shuts down' for a season. The *defendant's* enterprise is not such. Such was the finding of the Industrial Commissioner. It was affirmed by the district court.

"We hold that the finding was a proper one."

The holding of this court in the Forbes case, above quoted, clearly demonstrates that the commissioner was right in holding that the applicability of the statute depended upon the operations of appellant employer, without regard to other employers engaged in similar activity, and that the district court erred in holding otherwise.

In the Forbes case, this court was not called upon to construe and, therefore, did not discuss the effect of the change of the statute from "it is the custom to operate for a part of the whole number of working days in each year" to "customarily shuts down and ceases operations during a season of each year". If this language has substantially the same meaning in each instance, then the Richards case appears to be contrary to the holding of the commissioner herein, and to support the holding of the district court. We are of the opinion that the phrase employed by the legislature in each instance conveyed substantially the same meaning. It seems obvious that if "it is the custom to operate for a part of the whole number of working days in each year", this is true because the employer "customarily shuts down and ceases operations during a season of each year". Also, there is a difference between the words "construction", "repair", "maintenance" and "operation". The commissioner held that all four of these words are included within the word "operation". Courts have held otherwise, including this court.

An illustrative case is that of State, ex rel. City of Chillicothe v. Wilder, 200 Mo. 97, 98 S. W. 465, 467. In that case, the law authorized a city to incur indebtedness for the purpose of "purchasing or constructing waterworks, electric or other light plants". The city of Chillicothe passed an ordinance to issue bonds to be used "for the purpose of erecting, constructing,

maintaining and operating a waterworks and electric light plant.'' In holding that the city exceeded its power in undertaking to issue bonds to *maintain* and *operate* a waterworks and electric light plant, the court states, 98 S. W. at page 467 as follows:

"It is a well-settled law of this state that municipal corporations possess, and can only exercise, such powers as are granted in express words, or those necessarily incident to or implied in the powers expressly granted. City of Nevada v. Eddy, 123 Mo., loc. cit. 557, 27 S. W. 471. We do not think it can be reasonably maintained that the power to maintain and operate waterworks is necessarily incident to or implied in the power to purchase or construct waterworks or electric light plants, on the contrary, we think it was the purpose of the people in conferring this power upon cities of the population named to acquire waterworks and electric light plants which should be self-sustaining. The word 'maintain' does not mean 'to provide or construct;' but to keep up and preserve, and the word 'operate' means to put into or continue in operation or activity. These expressions have a distinct signification from the words 'purchase or construct.' ''

The holding of the Missouri court is in accord with our holding in the case of Slaats v. C. M. & St. P. R. Co., 149 Iowa 735, 129 N. W. 63. In that case, plaintiff sought damages pursuant to the provisions of section 2071 of the Code of 1897, whereby liability was imposed upon a corporation, in the consequence of wilful wrong "in any manner connected with the use and *operation* of any railway". The plaintiff was injured while engaged in the repair of a locomotive. In holding that "reconstruction or repair" work did not constitute "operation", this court states, 149 Iowa at page 738, 129 N. W. at page 64, 47 L. R. A., N. S., 129, Ann. Cas. 1912D, 642, as follows:

"But the machine shops are the hospitals. The engines, cars, and the like are only taken there when disabled and withdrawn from use when this is essential to refit them for actual service in the operation of the railway. Manifestly, when so withdrawn and in the course of reconstruction or repair, they are in no wise connected with the operation of the railway."

Substantially the same interpretation was made of a different statute by this court in the case of Connors v. Chicago N. W. Ry. Co., 111 Iowa 384, 82 N. W. 953. That was an action for damages occasioned by a fire alleged to have been negligently permitted to escape by defendant's employees, when burning weeds and grass along its right of way. The plaintiff sought to take advantage of the provisions of section 1289 of the Code of 1873, which placed the burden of proof as to negligence upon the defendant, in the event that the damage arose out of the *operation* of the railroad. It was shown that the fire resulted from certain repair work being done upon the right of way. In holding that it did not arise out of the "operation" of the railroad, this court states 111 Iowa at page 386, 82 N. W. at page 954, as follows:

"It may be remarked, however, that an employe, 'in keeping in repair the track of a railroad for the present operation of its trains,' while he may be exposed to the hazards, is not engaged 'in the business of operating a railroad.' Such work is undoubtedly necessary therefor, but not in any way connected therewith."

As heretofore pointed out, both the industrial commissioner and the district court agree that the employer did shut down and cease operation during the summer of 1936. Apparently the principal, and perhaps only basis for disagreement as to prior summers was the fact that the commissioner included within the term "operation", the construction of an air shaft, whereas the district court rightly held that such construction work did not constitute operation of the mine. On the record here before us, we are satisfied that the district court was right in holding that, under the undisputed evidence herein, the employer had shut down and ceased operation during each year since its incorporation and the commissioner was in error in holding otherwise.

We are also of the opinion that the commissioner was wrong in his definition of the word "customary", and that the district court correctly defined such term. The use of the word, in the statute here before us, obviously was not intended to be a custom which takes the place of law. It is only necessary that the practice be customary on the part of the particular employer involved. The New Century Digest defines the term "custom-

ary'' as ''according to or depending on custom; usual; habitual''. The custom or habit of the particular employer need not have been followed since the memory of man runneth not to the contrary or for any analogous period. It is only necessary that the custom or habit exist for such a period that it can be said to be the custom or habit of the particular employer to operate on a seasonal basis. Under the record herein, the custom or habit of the employer was not new. It was the corporation that was new. The custom or habit was followed every summer since the incorporation of defendant employer. We are satisfied that the requirements of the statute were met. As the mine operated less than 200 days each year, the 200-day rule applied.

Some emphasis has been placed upon the exception to the commissioner's ruling on the burden of proof. In view of the result reached by us, it is not necessary to decide the question.

By reason of the foregoing, the judgment of the district court is reversed and the cause remanded with instructions to modify the judgment, limiting claimant's recovery to the compensation rate of $12 per week, stated in the memorandum of agreement, the extent of his recovery thereunder to be the amount tendered by the appellants.—Reversed and remanded with instructions.

OLIVER, C. J., and HAMILTON, SAGER, HALE, STIGER, and BLISS, JJ., concur.