Argued April 17; reversed October 21, 1941

## LAYMAN *v.* STATE UNEMPLOYMENT COMPENSATION COMMISSION ET AL.

### (117 P. (2d) 974)

Before KELLY, Chief Justice, and BAILEY, LUSK and RAND, Associate Justices.

James T. Landye, of Portland (Green, Boesen & Landye, of Portland, on the brief), for appellant.

H. Lawrence Lister, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for State Unemployment Compensation Commission.

Clarence D. Phillips, of Portland (Griffith, Peck & Coke, of Portland, on the brief), for Crown Zellerbach Corporation.

LUSK, J. The plaintiff has appealed from a decree of the circuit court sustaining an order of the State Unemployment Compensation Commission which denied in part the plaintiff's claim for unemployment compensation. The case involves the construction of § 7 of the Unemployment Compensation Law (8 O. C. L. A. § 126-707) and the sufficiency of the evidence to sustain the commission's findings. Section 7 reads as follows:

"Benefits in seasonal and irregular employment. (a) Whenever the commission finds that on account of seasonal conditions, it is highly impracticable or

impossible for the employer to operate for a period or periods of one year in length and the employer customarily operates only during a regularly recurring period or periods of less than one year in length, then the rights to benefits shall apply only to the longest seasonal period or periods which are customary in such operation, as determined by the commission. It shall be the duty of the commission to ascertain and determine, or redetermine, such seasonal period or periods for each such seasonal employer. When the commission has determined such seasonal period or periods, it also shall fix the right to benefits and the conditions required for the payment of benefits to unemployed persons of such employer, and shall modify the requirements of the right to benefit and the conditions required for the payment of benefits in such manner that the total benefits paid to such persons will be in reasonable proportion to the total contributions of such employer."

On December 29, 1937, the commission issued its ruling No. 24, in which, among other things, it determined that no benefits based on earnings of an employe in a "seasonal operation" should be payable to such employe for unemployment which occurs outside of the seasonal period. "Seasonal period" was defined as "the longest period of operation customary in a seasonal operation as determined or redetermined by the commission".

Under date of January 8, 1938, the commission determined that the defendant Crown Zellerbach Corporation, a Nevada corporation, is a seasonal employer with respect to its logging operations at its Lewis & Clark camp in Clatsop County, Oregon, and that the longest period of customary operation is from week No. 9 to week No. 52 of each year; in other words, that from weeks 1 to 9—roughly, the months of Jan-

uary and February of each year—it is highly impracticable or impossible for the corporation to operate on account of seasonal conditions, and that customarily it operates only during the regularly recurring period, March to December, of each year.

The plaintiff, Thomas Layman, was employed as a faller and bucker at Crown Zellerbach's Lewis & Clark camp at various times during the years 1936 and 1937 and until the end of 1937. He was unemployed during January and February, 1938, and, in his claim for benefits, demanded compensation on account of that unemployment as well as for other periods. The claim for the period of January and February, 1938,—which for convenience will be referred to as the nonseasonal period—was rejected by the commission on the basis of its previous rulings. Thereafter, on petition of the plaintiff, the case was referred by the commission to a referee who took testimony, reaffirmed the seasonality determination of the commission, and denied the claim for benefits for the months of January and February, 1938; and, the matter having again been brought before the commission, that body rendered its final decision denying the plaintiff's right to benefits for the period in question. The plaintiff thereupon sought review of the commission's determination in the circuit court for Clatsop county, as authorized by 8 O. C. L. A. § 126-711. After a hearing the court rendered an opinion sustaining the action of the commission and entered a decree accordingly.

■ The commission's authority, in the case of a seasonal employer, to withhold benefits on account of unemployment occurring in the nonseasonal period is not questioned. The sole controversy is upon the propriety of the commission's ruling that Crown Zeller-

bach is a seasonal employer with respect to its Lewis & Clark logging operation; and the decision of that question, as all parties agree, depends upon whether, in the record made before the referee, which is the record now before us, there is substantial evidence to support the commission's findings. If so, the court is without power to disturb the findings. 8 O. C. L. A. § 126-711.

The parties are likewise agreed that three conditions must concur before the commission is authorized to determine that an employer is seasonal. The commission must find that (1) it is highly impracticable or impossible for the employer to operate for a period or periods of one year in length; (2) that the employer customarily operates only during a regular recurring period or periods of less than one year in length; and (3) that these things are on account of seasonal conditions.

The parties are not, however, in agreement as to the meaning of some of these provisions. We shall state our views on this subject after summarizing the evidence.

The principal business of Crown Zellerbach is the manufacture of paper and paper products. It has extensive timber holdings in southwestern Washington and northwestern Oregon, the products of which are used mainly as a source of supply of raw materials for its paper mills at Camas, Washington, and West Linn, Oregon. The Lewis & Clark camp is located in Clatsop County on the west slope of the Coast Range, a few miles from the Pacific ocean. Until December of 1933 this operation was carried on at what is known as the Youngs River camp about fifteen miles northeast of its present location. For the purposes of this

case the two camps may be regarded as one, since the operations are of the same magnitude in character, and there is no difference in seasonal conditions. The normal summertime crew of the Lewis & Clark camp averages from 200 to 225 men. It employs what is termed a high lead or overhead type of logging equipment, cables being used to drag the logs in and skylines to transport the logs to the railroad over which they are hauled to water. Tractors are used to a small extent. Crown Zellerbach owns and operates the railroad through a subsidiary corporation. The period of greatest production is from April until October or November. January and February are normally the months when employment and production are at their lowest. There is evidence tending to show that this customary annual curtailment of logging activities is due to climatic conditions. It is shown that in that part of Oregon where this operation is located there is normally a season of heavy rain commencing in November or earlier and continuing until March, with many days of high southwesterly winds; that by January the soil becomes thoroughly saturated, and that as a result of this combination of conditions the difficulties and dangers incident to working in the woods are enhanced, the efficiency of the workers impaired, and the average of man-day production materially reduced. This is especially true in the case of an extensive operation with a large crew of men.

There was received in evidence commission's Exhibit 16, a graph showing the monthly log production in feet board measure at the Youngs River and Lewis & Clark camps in the eleven year period from 1928 to 1938. According to this graph there was no production in the months of January and February 1928,

1929, 1930 and 1931. The figures for the succeeding years are as follows:

| | |
|---|---|
| January, 1932 | About one and a half million feet. |
| February, 1932 | About two and three-quarters million feet. |
| January, 1933 | One and a half million feet. |
| February, 1933 | Approximately three and one-quarter million feet. |
| January, 1934 | Approximately two and a half million feet. |
| February, 1934 | Over three million feet. |
| January, 1935 | None. |
| February, 1935 | Approximately two and a half million feet. |
| January, 1936 | Over three and three-quarters million feet. |
| February, 1936 | Approximately three and one-quarter million feet. |
| 1937 | None. |
| 1938 | None. |

Production reached its highest point in July, 1937, when it approached nine million feet, and production for the months of January and February was usually below the average of the other months.

According to the witness Stamm, an employe of Crown Zellerbach charged with supervision of its logging operations in Oregon and southern Washington, and who prepared and explained Exhibit 16, a log is not produced until it has been taken down to the water. Production includes cutting by the fallers and buckers, pulling the logs in by the rigging crew, sometimes cold decking, placing the logs on the train and transporting them to water.

It was shown that there was a strike at the Lewis & Clark camp from 1935 until the spring of 1937, and the witness Stamm stated that the camp was shut

down on November 20, 1936, earlier than usual, for the reason, among others, that the state labor commissioner, who had been requested to attempt to bring about a settlement of the strike, had asked that the camp be shut down on that date. It was also shown that the shutdown near the close of 1937 was accompanied by a notice posted by the superintendent of the Lewis & Clark camps which read as follows:

"On account of curtailment at the paper mills the Bear Creek Camp and the Lewis & Clark Camps will close down Friday evening, December 17th for an indefinite period.

"The resumption of activities will depend on activity in the paper mills over the next two or three months. Employes are requested to leave their addresses with the timekeeper so they can be notified at the date of resumption of work.

"Crown Willamette Paper Company
"By T. B. Jackson "

Testifying as to the reason for the large production of logs in January and February of 1936, Mr. Stamm said that at this time a jurisdictional dispute between two unions was going on, and "I think that probably was one of the factors that was considered in logging that winter, because we hadn't built up a very big inventory and there was always uncertainty that that and other labor troubles might stop the movement of logs to the mill, and that was one of the reasons we kept on operating." He testified in that connection that they operated during the winter months at a greatly increased cost, but he produced no figures and did not state that that operation was carried on at a loss.

As stated, commission's Exhibit 16 shows that there was no production of logs in January and February

of the years 1928 to 1931 and none in January, 1935, or in January and February, 1937 and 1938. Claimant's Exhibits 10 and 11, prepared by the witness Stamm, contain data as to the nature and extent of the activities at the Youngs River and Lewis & Clark camps during the claimed nonseasonal months of the years 1929 to 1938, together with a record of the prevailing weather conditions. The evidence contained in these exhibits is uncontradicted and the source of it is Crown Zellerbach, one of the defendants. The following information respecting activities in periods during which commission's Exhibit 16 shows no production is taken from claimant's Exhibits 10 and 11:

JANUARY, 1929—10 men planting trees.

FEBRUARY, 1929—From the 1st to the 17th tree planting. From the 18th to the 28th falling and bucking and cold decking, the crews ranging from 65 to 143.

JANUARY, 1930—From the 1st to the 18th tree planting. The camp closed down on the 19th on account of cold weather.

FEBRUARY, 1930—Tree planting started on the 2nd. Cold decking started on the 10th with a crew of 96 men. This work, together with falling and bucking, continued until the 26th, the largest crew being 152 men.

JANUARY, 1931—The camp was closed down.

FEBRUARY, 1931—Cold decking and rigging up throughout the month. At least 25 men were working most of the time, though the number fell to 11 on one day and 10 on another.

JANUARY, 1935—There were no logging operations. The only work done con-

sisted of rebuilding the main line of the railroad and the shop and crushing rock.

Cold decking was explained by the witness Duggan as follows:

"A. The cold decking is the actual yarding of the logs and piling them up in piles. Get them from the piles without going out in the woods and getting them. They are filled into the cold deck tree straight from the sky lines.

"Q. In cold decking would you use the hook tenders?

"A. Yes.

"Q. Choker setters?

"A. Yes.

"Q. Would you use the whistle punks?

"A. Yes.

"Q. Generally use the whole rigging crew?

"A. The whole rigging crew and donkey crew.

"Q. Use the donkey crew to run the rigging? Anybody else?

"A. The rigging crew and donkey crew. That is all."

Stamm testified that "the biggest amount of timber that is not produced is the timber that we cold deck just as we are doing now (February 24, 1939) and wouldn't be counted in those figures (the production figures) because we count them in the preparatory time."

He explained that in the industry "when we say operating, logging, we mean that all phases of the complete operation are going on", but conceded that "if they had a swing crew and cold deck, then you are in production. That is logging."

■ There was much additional evidence, but none of it in any way modifies or detracts from the effect of

the foregoing. This evidence would support a finding that annually, in the months of January and February, there are substantial curtailments of employment at the Lewis & Clark camp during the months of January and February with intermittent periods of complete shutdown. Customarily the employer does not operate throughout the year with full crews but only from March to December. These curtailments of employment and occasional periods of shutdown are brought about, it could be found, by seasonal conditions. An argument could be and has been made that they are to be attributed to other causes, such as market conditions; but we think that argument, while a proper one to have been addressed to the commission, goes to the weight of the evidence and not to the existence of substantial evidence, and therefore cannot be considered by the court.

■ It has also been contended that rain and other weather conditions are not "seasonal conditions" within the meaning of the statute. The proposition is asserted in plaintiff's brief that "seasonal conditions are that type of conditions which are present because of definite seasons of the year, and seasonal conditions do not mean irregular conditions that might be present because of short periods of bad weather." Cases are cited in support of the proposition, but, as we view it, they are not in point because the language of the statutes with which they deal differs from that of § 7. They speak of "seasonal employments", "seasonal occupations" and "seasonal employes". No doubt the Pennsylvania court, for example, in *Froehly v. Harton Co.*, 291 Pa. 157, 139 Atl. 727, rightly held that "seasonal occupation" does not mean "labor or occupation possible of performance and being carried on at any time

of the year or through the entire twelve months", but includes only such occupations as hop picking and gathering the peach crop, or "those vocations which cannot, from their very nature, be continuous or carried on throughout the year". But we think it obvious that "seasonal conditions" include conditions of the weather peculiar to a particular season of the year, and that when the legislature said in substance that a seasonal employer is one for whom it is not possible or practicable to operate throughout the year on account of seasonal conditions it used language much wider in scope and meaning than the mere words "seasonal occupation" or "seasonal employment".

■■ But this may be put to one side, for, regardless of all other questions, the evidence not only fails to show that Crown Zellerbach customarily operates during a regularly recurring period of less than one year in length, but, on the contrary, demonstrates that this essential element of a seasonality determination is wholly wanting. Exhibit 16, without more, is proof of this statement, for even though it could be said that there is no operation without production, as that term is understood by the witness Stamm, it would still be true that there was substantial production, ranging from one and a half million feet in January, 1932, to three and three-quarters million feet in January, 1936, in nine of the twenty-two claimed nonseasonal months in the period from 1928 to 1938—production which went forward in five of the eleven years involved. In order to bring the employer within the statute it must be shown that he "*customarily* operates only during a regularly recurring period * * * of less than one year in length." Giving the word "customary" its commonly understood meaning of "habitual",—

the antithesis of "unwonted", "extraordinary", "rare"—as the defendants concede is proper, it is impossible to say that operation was the extraordinary thing at the Lewis & Clark camp during the claimed nonseasonal periods and cessation of operation the rule. In order for a practice to be customary over a period of years it need not, perhaps, be engaged in every year, but where it is observed in nearly half the years and abstained from during the remaining years, there is no custom one way or the other.

We are of the opinion, moreover, that claimant's Exhibits 10 and 11 show that Crown Zellerbach was operating during at least two of the months not included in the employer's record of production.

■ Perhaps as good a definition of the word "operate as any is that quoted from the new Shorter Oxford Dictionary in the case of *In re Owl Drug Co.*, 21 Fed. Supp. 907, 910: "To direct the working of, to manage, conduct, work (a railway, business, etc.); to carry out, direct to an end (an undertaking, etc.); chiefly U. S. 1880."

In *Polich v. Anderson-Robinson Co.*, 227 Iowa 553, 288 N. W. 650, the court construed a provision of the Iowa Workman's Compensation Law fixing the basis of computation for compensation for employes in a business or enterprise "which customarily shuts down and ceases operation during a season of each year." The employer was a coal mining company which regularly ceased the production of coal from the middle of April until the first of September. The only work done during the shutdown period was maintenance, repair and construction work. This the court held did not constitute operation. The opinion cites the case of *Slaats v. Chicago M. & St. P. R. Co.*, 149 Iowa

735, 129 N. W. 63, 47 L. R. A. (N. S.) 129, Ann. Cas. 1912D, 642, in which the work of repairing a locomotive was held not to be work connected with the operation of a railway. In that case the court said:

"But the machine shops are the hospitals. The engines, cars, and the like are only taken there when disabled and withdrawn from use when this is essential to refit them for actual service in the operation of the railway. Manifestly, when so withdrawn and in the course of reconstruction or repair, they are in no wise connected with the operation of the railway."

To the like effect is *Connors v. Chicago & Northwestern Railway Co.*, 111 Iowa 384, 82 N. W. 953.

In the Polich case the court compared the language of the statute then applicable with its language before amendment. The change was from "it is the custom to operate for a part of the whole number of working days in each year" to "customarily shuts down and ceases operations during a season of each year." It was held that no substantial change in meaning had been effected, the court saying:

"It seems obvious that if 'it is the custom to operate for a part of the whole number of working days in each year', this is true because the employer 'customarily shuts down and ceases operations during a season of each year' ".

Another case applying the Iowa statute is *Forbes v. Ottumwa Sand Co.*, 216 Iowa 292, 249 N. W. 399. The employer in that case was engaged in collecting sand and gravel by the use of dredges, and by grading, classifying, and preparing the same for sale to contractors and builders. In the wintertime it collected, sold and delivered to customers large quantities of ice which it cut and collected from the Des Moines

river. The plaintiff was drowned while engaged in cutting ice for the defendant. The ice cutting season lasted for an average of eleven days in the wintertime. The dredging operations stopped about the first of December when freezing weather set in. The decedent was not one of the employes whose employment was continued throughout the winter. The company operated in the wintertime, but with a much reduced force. It was held that the statute was not applicable because there was no shutdown of the enterprise itself and that the marketing and delivery of the stocks of sand, which continued from one end of the year to the other, constituted continuous operation of the enterprise.

The defendants have cited the case of *State v. American Bonding & Casualty Co.*, 225 Iowa 638, 281 N. W. 172. The question there was whether the receiver of an insolvent corporation was operating the property or business of the corporation within the meaning of § 239 (a) of the Revenue Act of 1924 so as to make him liable for the payment of income taxes. The principal part of the corporation's business was the writing of casualty insurance policies. Owing to the great number and magnitude of the claims and the litigation connected with the proving and allowance thereof it was impossible to make immediate distribution, and, instead of reducing the assets in his hands to cash, the receiver, under the direction of the court, collected the interest on the securities in his hands, collected the rents of real estate which came into his hands from foreclosure of mortgages held by him, invested the moneys that thus came into his hands as additional securities, and collected the income therefrom. These activities were held to be a part of the business of the corporation. The case was distinguished

from *In re Owl Drug Co.*, supra, where the business of the corporation was the operation of drug stores and not the investment of money or collection of interest thereon, and the mere acceptance of interest on moneys deposited in the bank for a brief interval pending its distribution was held not to be the operation of the business or property of the corporation.

The defendants lay special emphasis on the following language from the opinion in the Owl Drug Co. case:

"The operation of a business implies its conduct and management not sporadically, but continuously over a definite period of time, with one aim—*profit making*".

These tax cases have very little bearing on the question before us. The courts were there chiefly concerned with the question whether the receivers were engaged in the business for which the insolvent corporations were organized. The language above quoted from the Owl Drug Co. case was used in connection with the facts of that case—the occasional receipt of interest by the receiver of a corporation engaged in the drug business from a fund kept in bank pending its distribution. If the test there laid down were applied here it would not help the defendants, for there can be no doubt that in the sense in which the court was speaking Crown Zellerbach conducts and manages its logging business, not sporadically but continuously, throughout the year. Whether it operates its Lewis & Clark logging camp continuously within the meaning of § 7 is another question.

We concur in the view of the Iowa court, expressed in the cited cases, that repair, maintenance, and construction work are not to be deemed operation, and

therefore that there was no operation in January, 1929, or January, 1930, when the only work was tree planting, nor in January, 1935, when the only work was reconstruction of the railroad line and shop; but we do not think that this is true of the work done in February, 1929, and February, 1930, when crews of men, not up to the normal average in number it is true, but, nevertheless, of substantial size, were falling, bucking, and cold decking—activities which are integral parts of a logging operation. We omit further reference to February, 1931, when the crews never exceeded twenty-five in number.

 Production, as defined by Stamm, is not synonymous with operation, and an employer may be operating a logging camp notwithstanding all the various jobs, from falling the tree to dumping the logs in the water and scaling them, are not being performed. According to the Iowa court, with which we agree, a shut down of a plant means the same thing as cessation of operations. *Polich v. Anderson-Robinson Co.,* supra. The Lewis & Clark camp was not shut down during the time that this work was being done.

Again, it may well be doubted that there is any evidence to support the view that the shutdowns in January and February of 1937 and 1938 were due to seasonal conditions. It is conceded that labor difficulties were a contributing cause in 1937 and lack of demand for logs at the paper mills a contributing cause in 1938. It does not appear that weather conditions—rain, wind, etc.—were substantially different in those years from other years when there was operation. Stamm testified that the shutdown on November 20, 1936, at the request of the state labor commissioner, was "earlier than usual" for that reason, but in view

of the record of operation in so many of the claimed nonseasonal months, it would be only a guess to conclude that there would have been no operation in January and February, 1937 and 1938, had these other factors not been present.

In addition to all this, the evidence of large production in January and February, 1936, because of anticipated labor difficulties, casts grave doubt on the contention that it was impracticable to operate throughout the year on account of seasonal conditions.

■ As to these questions, we are not advised what were the views of the referee or the commission, because there are no specific findings. But, though it should be granted that as to all the months when there was no operation there was evidence which would support a finding that this was the result of seasonal conditions, the conclusion would be in no way impaired that there is no evidence that there was a customary cessation of operations at the Crown Zellerbach camp during the months of January and February. For the record establishes affirmatively that the employer did operate, not only in nine of the twenty-two months when there was production but in two additional months when there was no production—or in half of all the months in question. It shows that during those months the employer operated with reduced crews, and that in some of them there were periods of shutdown. It falls far short of establishing the essential requirements of the statute.

In making the ruling complained of the commission appears to have acted under a misconstruction of the meaning of § 7. That is indicated by the testimony of one of the commission's experts who assisted in the determination, that a "recurring period of substantial

curtailment in the volume of employment" is one of the factors to be considered, and it is manifested by the following statement in the defendants' brief: "The commission and the trial court have held that where there is a regular recurring, substantial and material reduction in an employer's operation he is not operating within the meaning of that term as used in § 7." We are further told that the legislature has left the application of the term to the sound discretion of the commission. That comes to the same thing as saying that the commission is vested with discretion to ignore the statute. If the commission may decide that an employer is not operating when all the evidence demonstrates the contrary it may as well hold an employer is seasonal although seasonal conditions have nothing to do with the case.

If there could be any possible doubt that cessation of operations does not mean the same thing as operating with a reduced crew the amendment of § 7 by the 1941 legislative assembly (Oregon Laws, 1941, Ch. 447), should erase that doubt. This amendment leaves the old section 7 intact as subdivision (a), and then provides:

"(b) With respect to benefit payments made for the benefit year 1942 and thereafter subsection (a) hereof shall have no application, but the commission shall each year determine as seasonal employers any employer or operating unit which has reduced its employment in each of the last four completed calendar years during the same period or periods of 12 consecutive weeks or more to such an extent that the pay roll for each week of such period or periods is less than 45 per cent of the average weekly pay roll for the three four-week periods of the year in which the pay roll is highest."

■■ ■ There are other changes in the section, but they are not pertinent to the present discussion and need not be noticed. An amendment to an act may be resorted to for the discovery of the legislative intention in the enactment amended. 25 R. C. L., Statutes, 1064, § 288; *In re Hurle,* 217 Mass. 223, 104 N. E. 336, Ann. Cas. 1915 C, 919, L. R. A. 1916 A, 279. The amendment in question might almost be regarded as a legislative declaration of the meaning of § 7. In substance the legislature has said that until 1942 cessation of operation is essential to a determination of seasonality; but thereafter reduction of employment to the extent prescribed will suffice; and that these are not one and the same thing.

The defendants' brief indicates that the commission's determination was influenced, if not largely controlled, by what were deemed the necessities of the case. These considerations are now pressed upon the court. It is said that the decision was necessary in order to carry out the mandate of the last sentence of § 7, and we are urged to consider the fact that the payment of unemployment benefits to employes in the logging industry is far in excess of contributions to the fund made by the employers, and to be heedful of the danger that the fund will be rendered insolvent and the purposes of the act frustrated if the commission's construction is not approved.

The last sentence of § 7 reads:

"When the commission has determined such seasonal period or periods, it also shall fix the right to benefits and the conditions required for the payment of benefits to unemployed persons of such employer, and shall modify the requirements of the right to benefits and the conditions required for the payment of benefits in such manner that the total benefits paid

to such persons will be in reasonable proportion to the total contributions of such employer.''

■ The argument is in effect that the commission is authorized to declare an employer seasonal when it becomes necessary to do so in order to bring benefits paid to unemployed persons into line with contributions made by employers. We cannot yield to this argument without ignoring the plain language of the statute. The only basis for a determination of seasonality is the existence of the conditions stated in the first sentence of § 7. If those conditions are present and the commission so finds it may declare the employer seasonal, and *then in consequence of such determination* the commission may exercise the authority granted in the concluding sentence of the section. It is not authorized to make the expediency or desirability of exercising that authority the test of the question of seasonality.

■ The pleas that the fund may be depleted if the commission's decision is not sustained, and that excessive benefit payments are being made in the logging industry, are akin to that which has just been considered. They might well be addressed to the legislature, but, we think, have no place here or before the commission.

■ It is an elementary and fundamental principle, which no one will dispute, that a commission, created by the legislature to administer a statute, is wholly limited in its powers and authority by the law of its creation. No more unwholesome doctrine could be suggested than that such a body is vested with discretion to ignore or transgress these limitations even to accomplish what it may deem to be laudable ends. That would be to leave room for that ''play and action of

purely personal and arbitrary power" condemned in *Yick Wo v. Hopkins,* 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220, 226. If the statute as written is not workable, then the remedy is with the legislature, which apparently has already seen the necessity of change in respect of the particular provisions with which we have been dealing.

We are of the opinion that the commission in making the seasonality determination in question exceeded its authority, and that there is no substantial evidence to support its findings. The plaintiff is entitled to payment of the benefits in controversy, and the order and decree of the circuit court affirming the commission is, therefore, reversed.