133 So.2d 813 (1961)
Mrs. Joyce King SWILLIE, Plaintiff and Appellee,
v.
GENERAL MOTORS CORPORATION et al., Defendants and Appellants.
No. 296.
Court of Appeal of Louisiana, Third Circuit.
September 20, 1961.
Rehearing Denied October 11, 1961.
Certiorari Denied November 29, 1961.
Smith & Taliaferro, by Wedon T. Smith, Jonesville, and Stafford & Pitts, by John L. Pitts, Alexandria, for defendants-appellants.
Watson, Blanche, Wilson, Posner & Thibaut, by David W. Robinson, Baton Rouge, for plaintiff-appellee.
Before HOOD, FRUGE and CULPEPPER, JJ.
CULPEPPER, Judge.
In this tort action Mrs. Joyce King Swillie, individually, and as natural tutrix of her two minor children, Pamela Joy Swillie, and Rufus Scottie Swillie, seeks damages for the alleged wrongful death of her husband, Rufus Swillie, who was killed *814 when his loaded gravel truck ran through a T-intersection and thence off the highway into a deep ditch. Named as defendants were General Motors Corporation; Troyce Guice, d/b/a Guice Chevrolet Company and his insurer, Great American Indemnity Company; Natchez Steel Products Company, Inc., and its insurer, Liberty Mutual Insurance Company; Natco Equipment Company, Inc. and Wagner Electric Company. By a vote of nine to three, the jury in the district court awarded judgment in favor of the plaintiff individually in the sum of $30,000, and as natural tutrix of the said two minor children in the sum of $25,000 each, for a total of $80,000, the said judgment being against only the defendants, Natchez Steel Products Company, Inc. and its insurer, Liberty Mutual Insurance Company. Plaintiff's demands against the remaining defendants were rejected and dismissed. From said judgment the defendants, Natchez Steel Products Company, Inc. and Liberty Mutual Insurance Company, have appealed. Plaintiff has answered the appeal asking that the award in her favor individually be increased from $30,000 to $56,345.
The evidence shows that the accident occurred at about 12:40 P.M. on May 19, 1959 at the "T" intersection of Sandy Lake Road (Louisiana Highway No. 259) with the Jonesville-Harrisonburg Highway (Louisiana Highway No. 18) about three miles north of Jonesville, Louisiana. Rufus Swillie was driving his new 1959 Chevrolet truck on which there was installed a dump body and a "Natchez Double Loadster", which is a patented device manufactured by the Natchez Steel Products Company, Inc., for the purpose of increasing the load capacity. The truck was actually loaded with eleven yards of gravel weighing about 33,000 pounds. As Swillie, traveling in an easterly direction on Sandy Lake Road, approached the Jonesville-Harrisonburg Highway, which said junction as aforesaid forms a T-intersection, the truck did not stop at said Jonesville-Harrisonburg Highway, but ran across and off the same and into a ditch approximately 100 feet east thereof, causing Rufus Swillie to be fatally injured.
It is the contention of the plaintiff that the cause of this accident was the failure of the hydraulic brake system on the truck before it left the road. Plaintiff alleges this brake failure was due directly to the breakage of an improper flare (90 degrees rather than 45 degrees) made in the brakeline to the left rear wheel when the hydraulic brake system of the truck was extended during the installation by Natchez Steel Products Company, Inc. of the "Natchez Double Loadster" which is an additional or third axle beneath the dump body. On the other hand, it is the contention of the appellants that this accident was not caused by brake failure or by any negligence on the part of Natchez Steel Products Company, Inc. but, to the contrary, was caused by Rufus Swillie either going to sleep or becoming so exhausted that he ran through the intersection and into the ditch.
The first issue for determination by the court is whether plaintiff has shown by a preponderance of the evidence that the accident was caused by brake failure. We have the testimony of two witnesses to this accident. Herschel Collins testified that he observed the truck approaching the intersection at a normal speed and in a normal manner, but he did not actually see the truck leave the highway and did not know of the accident until someone in Collins' car yelled to him that the truck was running on through the intersection. Quincey Dosher, who was traveling north on the Jonesville-Harrisonburg Highway stated that as he approached the intersection he observed the Swillie truck approaching from his left on the Sandy Lake Road at a distance of 200 to 300 yards from the intersection and traveling at a speed of about 35 miles per hour. It apparently appeared to Dosher that the Swillie truck was not slowing down properly for the intersection so he slowed his vehicle, and according to Dosher, the Swillie truck did not slow down, or attempt to turn to the right or the left at *815 the intersection, but went across and off the Jonesville-Harrisonburg Highway, sailed through the air as it left the shoulder, and thence traveled about 100 feet where it went straight down into a deep ditch and remained there right side up with the cab of the truck in the bottom of the ditch and the dump body sticking back up the side. Dosher, who was the first person to go to the truck after the accident, testified he observed at that time the brake light on the back of the dump body was on. Perhaps the most important part of Dosher's testimony is that immediately after the accident, and before any effort was made to pull the gravel truck out of the ditch, he observed that the brake line to the left rear wheel was loose from its connection at the wheel end.
State Trooper R. C. McGuffe, who arrived at the scene approximately 20 minutes after the accident, testified that his immediate concern was to try to pull the dump body and its load of gravel back off of the cab of the truck in order to free Rufus Swillie who was caught inside. (The frame of the truck was broken apart so that the cab and dump body were separated.) Trooper McGuffe stated that after two wench trucks arrived at the scene they hooked cables to the rear axle as well as to other parts of the truck and after considerable difficulty succeeded in pulling both the dump body and the cab of the truck out of the ditch. McGuffe did not observe the brake line to the left rear wheel until after the truck had been pulled out, at which time this line was broken. Other facts to which McGuffe testified were that after the accident the truck's emergency brake was pulled all the way back, that the truck did not touch the ground for 11 or 12 feet after it left the shoulder, and that his examination of Sandy Lake Road for a distance of about 300 feet back from the intersection revealed no skid marks or fluid of any kind on the road.
Deputy Sheriff Max Good, who arrived at the scene approximately 25 minutes after the accident, testified that after the two wench trucks had succeeded in pulling the gravel truck out of the ditch they found the body of Rufus Swillie laying over on the seat with his feet sticking out the door on the driver's side and the end of the emergency brake lever, which was pulled all the way back, had penetrated 3 or 4 inches into Swillie's body. Deputy Good further testified that his inspection of the road revealed no skid marks or oil or brake fluid, but that he did observe what appeared to be oil or fluid on the left rear wheel of the dump body.
Glasper Bowman, driver of the wrecker from Babin Motor Company in Jonesville, testified that when he arrived at the scene of the accident, the gravel truck had already been pulled out of the ditch. Bowman did observe that the emergency brake had been pulled all the way back and that the brake pedal was pushed all the way "to the floor" and stuck in that position. Bowman towed the Swillie truck back to Babin Motor Company where it remained until about one month later when Mr. Robinson, attorney for the plaintiff, and Mr. Alvin Doyle, Jr., expert automotive consultant for the plaintiff, came to Babin Motor Company for the purpose of inspecting the Swillie truck. Bowman testified that on that occasion he assisted Mr. Doyle in removing the brake lines and fittings which were taken by Mr. Doyle for further examination in his laboratory in Baton Rouge. Bowman testified that they were unable to remove the master cylinder of the hydraulic brake system but that from his examination of the cylinder by removing the top and dipping his finger inside he was of the opinion the cylinder was approximately onehalf full of fluid.
Both James Swillie, who drove another gravel truck belonging to his brother, the deceased Rufus Swillie, and the plaintiff, Mrs. Joyce King Swillie, testified that they had heard the deceased state on several occasions that in the event of a brake failure on a truck which he was driving he would lay down on the seat rather than attempt to jump from the truck.
*816 Mr. Alvin Doyle, Jr., a witness for the plaintiff, was qualified as an expert automotive consultant, whose principal business was to investigate the causes of accidents. Doyle visited the scene of the accident, examined the truck at Babin Motor Company on about June 18, 1959, which was one month after the accident, and with the assistance of Glasper Bowman removed the brake lines and fittings from the rear axle, taking them into his possession for further study in his laboratory in Baton Rouge. Doyle also examined the entire hydraulic and emergency braking systems of the truck. He testified that at the time of his examination the brake pedal was all the way down, the emergency brake lever was pulled all the way back and locked on, and the shoes of the emergency brake system were cammed tightly to the drum of the drive shaft in the on position. Doyle stated that he found what he identified as brake fluid on the tire and drum of the left rear wheel running outward in radial streaks which indicated to him that the left rear wheel was turning at the time this brake fluid was squirted on the inside surface thereof.
In his laboratory in Baton Rouge, Doyle examined microscopically the flare which he found in the fitting which had been removed from the drum of the left rear wheel and discovered that this flare, which had been broken away from the copper tubing leading to the left rear wheel, had been made at 90 degrees on the outside instead of the proper 45 degrees. It was Doyle's opinion that due to normal vibration and fatigue this defective flare broke loose from the copper tube allowing the tube to come out of the fitting so that when the brake pedal was applied the fluid simply squirted out the open end of the copper tubing which was pointed in the direction of the left rear wheel.
Under cross-examination Doyle testified his theory of this accident was that the average experienced driver would have begun to decelerate for this intersection, at a distance of 600 to 700 feet, by removing his foot from the accelerator and that he would thereby reduce his speed to approximately 30 miles per hour, when he had reached a distance of about 300 feet from the intersection, at which point he would begin to apply his brakes. Doyle testified that, in his opinion, Swillie had full braking power on the first pump and he could not speculate as to how far the truck traveled after this first pump, before the brakes failed, but when they did, the brake pedal would have gone to the floor and the driver probably would have then pumped a second and a third time, and continued to pump until he realized that the brake system had failed. As Doyle's theory continues, when Swillie realized that his braking system had failed he reached for the emergency brake, which admittedly will not stop a loaded truck in so short a distance, since it acts only on the drive shaft, and was frantically trying to stop the truck with the emergency brake when he ran off the highway and into the ditch.
Doyle's testimony (as well as that of defendant's expert, Dr. Tonn) shows that the master cylinder of the hydraulic brake system has a valve which prevents fluid from leaving the cylinder unless the brake pedal is applied, from which fact Doyle is of the opinion that Swillie is bound to have pumped the brake as the truck was moving in order for the fluid to have been squirted in radial streaks onto the left rear wheel. Doyle stated positively that his examination of the truck at Babin's revealed that the master cylinder was entirely empty, and not one-half empty as testified to by Glasper Bowman.
In support of their contention, the appellants first introduced the testimony of Dr. William H. Tonn, Jr., a consulting engineer whose principal business is also the investigation of the causes of accidents. Dr. Tonn also inspected the scene of the accident, the truck, the braking system, the copper tubing and the flare in question which Dr. Tonn readily admits showed an outside angle of 90 degrees instead of the approved and recommended 45 degrees. *817 Dr. Tonn acknowledged that a 45 degree flare was proper and that actually he had never heard of a 90 degree flare being recommended nor had he ever heard of a tool designed to make a 90 degree flare, but he stated that in his opinion "the 90 degree flare can be just as strong as the other one." It was Dr. Tonn's opinion that in this case the evidence did not show the accident was caused by brake failure, primarily because the copper tube leading from the junction block near the center of the axle to the left rear wheel had to be fastened securely at both ends, that is, at the left rear wheel and at the junction block, at the time this piece of tubing was torn off and broken away from both of said ends which, in Dr. Tonn's opinion, was done when the gravel truck was being pulled out of the ditch with cables attached to the rear axle. The only portions of this particular piece of tubing which survived the confusion of the accident and have been examined by both Mr. Doyle and Dr. Tonn are a short piece approximately one-half inch in length remaining in the fitting at the junction block which, in Dr. Tonn's opinion appears to have been pulled, bent and torn loose, and the flare found in the fitting at the left rear wheel which, in Dr. Tonn's opinion was also pulled loose by the cable attached to the rear axle during the removal of the truck from the ditch.
Dr. Tonn explains the presence of the brake fluid on the left rear tire and drum by stating that it could have gotten there immediately after the accident while the rear wheels were free of the ground and turning or it could have gotten there as the truck was being towed back to Jonesville. (We note that neither of these theories explains how the brake fluid could have been pumped out of the master cylinder after the accident.) Dr. Tonn could express no opinion as to the cause of the accident, but stated that the evidence was insufficient to determine that it was caused by brake failure. However, when asked on cross-examination whether he would change his opinion if the evidence showed that the brake line was loose from the left rear wheel immediately after the accident and before the cables were attached, he admitted that it would then have to be his conclusion that the line came loose "as a result of fatigue, contributed to vibration" if, of course, nothing had hit the line as it left the road and went into the ditch.
Defendants also introduced the testimony of Deputy Sheriff J. W. Adams who testified that he went to the scene, but observed no skid marks or brake fluid on the road for a distance of 300 feet from the intersection. David Tatten, driver of the wench truck which assisted in pulling the Swillie truck out of the ditch, testified that they were working hurriedly and had to tie and re-tie the cables to the axles several times. Defendants also introduced the testimony of J. E. Juneau who testified that he was driving a gravel truck on the same job as Swillie on the morning of May 19, 1959 and saw Swillie sitting in his truck with his head laying on the steering wheel and heard Swillie say that "he was a little bit sleepy, but had to work to pay for his truck".
In support of their contention that this accident was caused by Rufus Swillie going to sleep at the wheel, defendants argue that Swillie had driven his truck approximately 800 miles between 4 o'clock Monday morning, May 18, and 12:40 p. m. Tuesday, May 19, when the accident occurred and that he had received only about 4 hours sleep in this period. However, as we view the record, the truck had been driven a total of 855 miles at the time of the accident, but the evidence does not show how many miles were on the truck at the time Rufus Swillie acquired it in Natchez, Mississippi, on the previous Saturday, nor does it show how many miles the truck had been driven before Swillie started to work on Monday morning. Furthermore, the evidence shows that Swillie went to bed between 9:30 and 10 o'clock Monday night and was awakened on Tuesday morning at 4 o'clock, which means that he slept at least 6 hours that night.
*818 Defendants also argue from the manner in which the truck went through the intersection without slowing down or attempting to turn to the right or to the left or leaving any skid marks that Swillie must have been asleep. They contend the average prudent driver, according to Mr. Doyle's testimony, would have started to decelerate at 600 to 700 feet before reaching the intersection and would have slowed to approximately 30 miles per hour by the time he reached a point 300 feet from the intersection at which time he would have applied his brakes. Defendant argues from Mr. Doyle's testimony that the driver would have pumped his brakes two or three times, each pump taking one-half second, which at a speed of 30 miles per hour would have meant that the truck would have traveled 60 to 80 feet, and would still be at least 220 feet from the intersection when the driver finally realized that this hydraulic brake system had failed. Defendants contend that in this 220 feet Swillie could have slowed enough to stop or turn. The obvious fallacy in this line of reasoning, as pointed out by Mr. Doyle, is that there is no way to speculate how far the truck traveled after the brakes were first applied and before the brakes failed. As stated above, Mr. Doyle opined that there was full braking power on the first pump and that the truck traveled some unknown distance before the brakes failed, and therefore the truck could have been very close to the intersection by the time the driver finally realized that his hydraulic brake system had failed.
Defendants further contend that the absence of any brake fluid on the pavement indicates the brake line did not break apart while the truck was on the highway. The answer to this argument is that actually the master brake cylinder contained only a small amount of fluid and this was sprayed against the left rear wheel and not onto the highway. The evidence shows clearly that if the brake line broke and parted from the fitting on the left rear wheel, the open end of the line was pointed toward the wheel, where brake fluid was actually found, and not down toward the pavement.
In our opinion the evidence in this case shows by a clear preponderance that the accident was caused by brake failure due to the defective flare at the left rear wheel breaking away from the copper tubing as a result of normal vibration and fatigue. This conclusion is most logical in view of the following evidence: The way in which the Swillie truck approached and ran through the intersection and into the ditch; the brake line observed by Quincey Dosher to be broken away from the left rear wheel immediately after the accident; the presence of the brake fluid in radial streaks on the drum and tire of the left rear wheel which most logically is explained as having come from the open end of the copper tubing as Swillie pumped the brakes in a frantic effort to stop; the fact that the master cylinder was found to be at least one-half, if not completely empty, which in the light of the admitted fact that this fluid could not have escaped from the master cylinder unless the brakes had been applied by Swillie, means that he is bound to have pumped the brakes in order to force the brake fluid from the cylinder; that after the accident the brake pedal was found pushed to the floor, the brake light on, and the emergency brake lever pulled all the way back with the emergency brake system in the on position; that Swillie's body was found laying on the seat in a position which he had told others he would take if the brake system ever failed. All these facts lead logically and preponderantly to the conclusion that the accident was caused by brake failure. No other logical or reasonable explanation under the evidence has been advanced by the defense.
Having concluded that the accident was caused by brake failure due to a defective flare, we have no difficulty in finding that the installation of this defective flare was negligence which proximately *819 caused the damages herein sought. The defective flare in question was admittedly made and installed by the employees of the defendant, Natchez Steel Products Company, Inc. in their machine shop in Natchez, Mississippi. The tool used to make this flare is so constructed as to permit flaring of different size tubing with a set of dies, but unfortunately, if these dies are placed in the flaring tool upside down, the tubing will be flared on the outside at 90 degrees (on the flat bottom surface of the die) instead of the proper 45 degrees. When this is done, the angle of the flare is more critical and can be very weak. Actually, if enough pressure is applied to the flaring tool with the dies upside down, the flare can be completely cut off. Therein lies the tragedy of this case. Natchez Steel Products Company, Inc. concedes that the brake line connection at the left rear wheel was flared at a 90 degree angle. As stated above, we have already found that it was this particular flare which broke and caused the brake failure resulting in the accident. Clearly this is negligence for which Natchez Steel Products Company, Inc. is liable.
The next issue presented by this appeal is the liability of the defendant, Liberty Mutual Insurance Company, under its Comprehensive General Liability Policy issued to Natchez Steel Products Company, Inc. It is the contention of Liberty Mutual Insurance Company that the liability of the Natchez Steel Products Company, Inc. in this case comes within the "Products Hazard" as defined in the policy, which coverage was specifically excluded by special endorsement which states that the policy "does not apply to the products hazard as defined herein." The policy in Section 3 of Conditions defines products hazard as follows:
"(c) Products Hazard. The term `products hazard' means (1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured or on premises for which the classification stated in division 1 of the declarations excludes any part of the foregoing' provided, such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold;
"(2) operations, if the accident occurs after such operations have been completed or abandoned and" occurs away from premises owned, rented or controlled by the named insured; provided, operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided, further, the following shall not be deemed to be `operations' within the meaning of this paragraph: (a) Pickup or delivery, except from or onto a railroad car, (b) the maintenance of vehicles owned or used by or in behalf of the insured, (c) the existence of tools, uninstalled equipment and abandoned or unused materials and (d) operations for which the classification stated in division 1 of the declarations specifically includes completed operations."
Liberty Mutual contends that, in the language of liability insurance policies, the hazard of accidents occurring after the manufacture and sale of goods, or after the completion of the work or services (if no goods are involved) is referred to as the "products hazard" or "completed operations hazard."; that in the products hazard category are placed the hazard of warranty of goods after manufacture and sale and the hazard of the accidents occurring after *820 the completion of the work covered in the declarations; that the products or completed operations hazard is a specially defined risk, for which an extra premium must be paid and that this is the risk which is expressly excluded in the policy here involved; that the assured purchased only ordinary operations coverage for his machine shop, paying no premium for products or completed operations insurance and therefore any accidents such as this occurring after the sale and delivery of a product or after the completion of the work contracted for, were not covered, the dividing line being the moment of completion of work done or the sale and delivery of the manufactured product.
Plaintiff and Natchez Steel Products Company, Inc. contend primarily that although the Natchez Steel Products Company, Inc. originally manufactured this Natchez Double Loadster, it sold this product to Natco Equipment Company, Inc., a sales organization, which in turn sold the said Natchez Double Loadster to Guice Chevrolet Company; that Natco Equipment Company, Inc. paid Natchez Steel Products Company, Inc. $100 for installing the double loadster on the truck sold by Guice to Swillie. Since the defective flare was made during the installation, rather than during the manufacture of the double loadster, it is the contention of plaintiff and Natchez Steel Products Company, Inc. that the liability in this case is covered under provision 1 of the declarations of the policy which states that the insurer assumes the risk of any hazard incident to the operation of the "machine shops" of the insured and is not affected by the products hazard exclusion.
The facts pertinent to the issue of coverage are that the Natchez Double Loadster is a patented device consisting of a steel frame and axle which can be added to a truck to increase the load capacity. This product is manufactured by Natchez Steel Products Company, Inc. but is distributed and sold by Natco Equipment Company, Inc., a sales organization, as well as by other distributors appointed by Natchez Steel Products Company, Inc. If a unit is sold by a distributor other than Natco Equipment Company, it is installed by that distributor, but if it is sold by Natco, it is installed by Natchez Steel Products Company, Inc. because Natco Equipment Company has no machine shop or other facilities for that purpose. Mr. Fite, who is the president of both Natchez Steel Products Company, Inc. and Natco Equipment Company, Inc., explained that he created Natco as a separate corporation in order to avoid confusion as to the payment of the Federal Excise Tax which is 10% of the manufacturer's price rather than 10% of the retail sales price.
Mr. Fite explained that when Natco, or one of the other distributors, obtained a sale for a double loadster they would send to his machine shop in Natchez and pick up the double loadster and at the same time pick up a brake kit containing copper tubing, fittings and other parts necessary to install the brake line of the right size and type for the truck on which the double loadster was to be placed. The brake line could not be installed on the double loadster during the manufacturing process because of the variance in the types of brake systems of the trucks and the lengths which would be required of the tubing.
In this particular case, Rufus Swillie first talked to Mr. Fite, who is president of both corporations as stated above, and arranged for the purchase and installation of a Natchez Double Loadster on a truck which he had not yet actually purchased. Then Swillie went to Mr. Guice, of the Guice Chevrolet Company, and arranged with him for the purchase of the truck and the financing of both the cost of the truck and the cost of the double loadster. Actually, Mr. Guice did not at that time have in stock the particular model truck which Swillie desired, so Guice telephoned the Chevrolet dealer in Fayette, Mississippi and arranged to have the truck delivered by that dealer to the machine shop of Natchez Steel Products Company, Inc. at 7 o'clock *821 a. m. on Saturday, May 16, 1959, for installation of the double loadster. The truck was so delivered and the double loadster was installed by Natchez Steel Products Company, Inc. in its machine shop. At about 2:30 p. m. Saturday, May 16, Swillie went to the office of Mr. Guice in Wisner, Louisiana, and at that time they signed the Act of Sale and Mortgage, and Note for the 1959 Chevrolet truck with the dump body and double loadster installed for a total cash price of $7,995. Guice had already determined the price which he was going to have to pay Natco Equipment Company, Inc. for the double loadster. Then Guice and Swillie went to Natchez and picked up the truck at the machine shop of Natchez Steel Products Company, Inc. At that time Mr. Guice, d/b/a Guice Chevrolet Company, gave Natco Equipment Company his check in payment of its invoice for the Natchez Double Loadster and accessories in the total amount of $3,192.72, plus a "mounting charge" of $100, and taxes. All the necessary paper work having been completed, Swillie drove his truck home.
Under these facts Liberty Mutual argues that it was actually Natchez Steel Products Company, Inc., through its president, Mr. Fite, that sold to Guice Chevrolet Company the double loadster, installed and ready to go, for a total price of $3,296.84, and that therefore the installation was actually part of the manufacture and sale of the completed product. However, the invoice filed in evidence shows that Guice Chevrolet Company purchased this double loadster from Natco Equipment Company, Inc. of which Mr. Fite was also president. Guice paid Natco for the cost of the double loadster, plus an additional $100 for the cost of installation and Natco in turn paid Natchez Steel Products Company, Inc. for the double loadster and the installation charges. It is inescapable that Natchez Steel Products Company, Inc. and Natco Equipment Company, Inc. are separate and distinct legal entities, regardless of the purpose for which they were organized, or the fact that Mr. Fite was president of both corporations. Under these facts, it is our opinion that the manufacture of the double loadster was a separate and distinct operation from the installation of the double loadster and brake lines and the evidence is clear that it was during the installation that the defective flare was placed on this truck by employees of Natchez Steel Products Company, Inc.
Having reached this factual conclusion, it is our opinion that the case of Kendrick v. Mason, 1958, 234 La. 271, 99 So.2d 108, 114, is controlling here. In the Kendrick case, Mason had contracted with the Town of Jena, Louisiana, for the installation of a sewerage system. During the progress of the work his employees negligently cut or punctured certain natural gas pipelines which were never repaired. After the installation of the sewerage system had been completed by Mason and accepted by the Town of Jena, the leaking gas accumulated in a sewer pipe causing an explosion which resulted in the burning of the Kendrick home and serious personal injuries. Mason carried a comprehensive general liability policy with United States Fidelity & Guaranty Company which denied coverage, primarily on the grounds that its policy did not cover any damages sustained after the contract had been completed in that its policy specifically excluded coverage of accidents occurring after completion of the work undertaken, which coverage comes within the definition of "products hazard" as set forth in the policy. The policy in the Kendrick case contained the identical definition of "products hazard" as is contained in Liberty Mutual's policy in the instant case quoted hereinabove, and the court held as follows:
"The first part of this definition is conceded to apply or refer to the warranty of goods or manufactured products, but it is argued that the second part of the definition has reference to contractors. We do not think the language of the contract and the endorsements and documents attached *822 thereto warrant the conclusions urged as to this part of the definition; at least, the language used leaves the meaning vague, obscure and indefinite and it cannot be said, on this score, the policy is free from ambiguity. * * *
"In all probability, from a fair interpretation of the exclusion just referred to, the endorsement pertains to and excludes injuries arising out of the handling or use of products, goods, wares, or merchandise sold or rented if the insured has relinquished possession thereof to others and away from the premises owned, rented or controlled by the insured or on the premises for which the classification stated in Division (a) of the declaration excludes `any part of the foregoing', which could only mean the handling of goods or products of some kind.
"The defendant Mason handled no products, meaning `goods or products' manufactured, sold or distributed. He, therefore, did not want or need the coverage. The reference to the accident occurring after the operations have been completed and abandoned at or away from premises owned, rented or controlled by the insured means nothing more than the accidents occurring by reason of handling of products or goods, after any agreement tosell, rent or deliver the goods has been completed or the goods have been abandoned.
"It is significant that the policy contract does not recite that any of these exclusions pertains to or refers to contractors who have no products for sale but who have performed a contract for the installation of a public utility, as in the instant case, or even the erection of any structure, public or private; whereas the policy does specifically recite that the assured, C. N. Mason, is a sewer and water main contractor. By no means of interpretation known to us can it be positively asserted that the exclusions in the policy and the endorsements attached thereto referred to contractors, and we deem it the fundamental duty of the insurer to express clearly the limitations of its obligation.
"We find our conclusion amply supported by the case of Smith v. United States Fidelity and Guaranty Company, 1942, 142 Neb. 321, 6 N.W.2d 81, 83, wherein the following exclusion clause employed by the insurer relieved it of liability:
"This policy shall not cover loss from liability for, or any suit based (there) on, injuries or death; * * * (4) Caused by accidents occurring after final completion of the work performed by the insured at the place of occurrence of such accident.
"It is clearly apparent that in that cited case the exclusion clause covered completed operations of a work performed under a contract. Certainly this clause clearly expressed the insurer's non-liability for accidents occurring after completion of the work. In the instant case the exclusions and exceptions relied upon by the insurer to escape liability were not stated with clearness and precision, thereby defining the limits of its obligation therein. An analysis of the exclusion and exceptions therein clearly demonstrates an ambiguity and vagueness which under our well settled jurisprudence must be construed against the insurer. See Albritton v. Fireman's Fund Ins. Co., 224 La. 522, 70 So.2d 111, wherein general principles in the interpretation of insurance contracts are enunciated.
"We are constrained to conclude that liability exclusion provisions of the policy herein issued by the defendant to Mason are inapplicable herein for the reason that Mason handled no *823 products but was engaged solely as a contractor and the exclusion provisions of the policy have no application to the construction work performed by him. The policy was issued to fully protect Mason against liability for acts of negligence committed by him during his performance of the contract. The tort which was the proximate cause of the damages sustained by plaintiff was in fact and in law committed during the performance of the construction contract. Both the accident and the injuries resulting therefrom were brought about not from the completed and accepted sewer system but from the direct result of the acts of negligence committed during its construction. The policy covering said accidents for which premiums were charged was then in full force and effect; and the conclusion is inescapable that the insurer is therefore liable in solido with its insured, Mason."
Applying the law of the Kendrick case to the case at bar, it appears clear that when Natchez Steel Products Company, Inc. installed the defective brake line it was not handling or selling a product, but was simply performing work, that is, selling services for which it charged $100. Clearly, therefore, under the holding in the Kendrick case quoted above, part (1) of the products hazard definition relating to the handling, sale, etc. of goods and products has no application in the instant case. With reference to part (2) of the products hazard definition relating to completed operations, the opinion in the Kendrick case holds specifically that this "means nothing more than the accidents occurring by reason of handling of products or goods after any agreement to sell, rent or deliver goods has been completed or the goods have been abandoned." In other words, as we understand the Kendrick case, it is clear authority for the proposition that both part (1) and part (2) of the products hazard definition apply only to an insured who is handling products and has no application whatever to an insured who is only performing work, that is, simply selling services.
Fortifying their conclusion, the Supreme Court specifically states in the Kendrick case that the interpretation of products hazard which they found is logical and possible and the policy is therefore vague and ambiguous and must be construed against the insurer.
Being of the opinion that the decision of our Supreme Court in the Kendrick case is controlling here, we deem it unnecessary to discuss the other authorities cited. The following cases, many of which were cited by counsel, show clearly that the courts of other states have given various interpretations to "products hazards", particularly where such coverage was excluded. See Daniel v. New Amsterdam Casualty Company, 221 N.C. 75, 18 S.E.2d 819; New Amsterdam Casualty Company v. Ellzey, 5 Cir., 240 F.2d 618; General Casualty Company of Wisconsin v. Larson, 8 Cir., 196 F.2d 170; Hercules Company v. Royal Indemnity Company, D.C., 171 F.Supp. 746; Heyward v. American Casualty Company of Reading, Pa., D.C., 129 F.Supp. 4; Lloyds Casualty Insurer v. McCrary, 149 Tex. 172, 229 S.W.2d 605; Hardware Mutual Casualty Company v. Schantz, 5 Cir., 186 F.2d 868; Reed Roller Bit Company v. Pacific Employers Insurance Company, 5 Cir., 198 F.2d 1; 344 U.S. 920, 73 S.Ct. 386, 97 L.Ed. 709; Standard Accident Insurance Company v. Roberts, 8 Cir., 132 F.2d 794; United States Sanitary Specialties Corporation v. Globe Indemnity Company, 7 Cir., 204 F.2d 774; Kelly-Dempsey & Company v. Century Indemnity Company, 10 Cir., 77 F.2d 85; Clauss v. American Automobile & Insurance Company, D.C., 175 F.Supp. 641; Fidelity & Casualty Company of New York v. Fratarcangelo, 201 Va. 672, 112 S.E.2d 892.
Addressing ourselves now to the issue of quantum we find the jury awarded Mrs. *824 Swillie, individually, $30,000, and each of the two minor children $25,000 for a total of $80,000, but none of these awards are itemized so as to show how much is for loss of support, how much for loss of love, affection and companionship and how much for special damages for funeral expense and destruction of the truck. Defendants contend that the total award is excessive and should be reduced to an amount not exceeding $40,000. Plaintiff, in answering this appeal, does not complain of the award of $25,000 to each of the children, but contends, in her brief filed in this court, that she should be awarded at least $40,000 to cover the items of loss of support, love, affection and companionship, plus funeral expenses in the sum of $860.80 and net property damage of $6,345 (being the cost of the truck, $7,995, less salvage of $1,650) for a total award of $47,025.80 to plaintiff individually.
The evidence shows that at the time of his death Rufus Swillie was 29 years of age with a life expectancy of 36 years as calculated from the mortality table in LSA-R.S. 47:2405. Following plaintiff's marriage to the deceased in 1947 he did iron work in Alexandria, Baton Rouge and Natchez earning approximately $125 a week until in 1957 he moved back to Wisner, Louisiana, bought a dump truck, and started hauling gravel for A. B. Chisum Gravel Company. According to the testimony of Mr. Gordon Mitchell, manager of the bank in Wisner, Rufus Swillie deposited in the bank $10,544 in 1957 and $11,534 in 1958, and had deposited $5,514 during 1959 up to the date of his death on May 19, 1959. This corroborates Mrs. Swillie's testimony that her husband grossed about $10,000 in 1957 and $11,000 in 1958. The evidence shows without question that the deceased was a hard worker, was considered a good credit risk by the bank and by Mr. Guice and that he had a good reputation and good prospects for the future. Immediately prior to his death, Swillie had purchased his second ten-yard gravel truck which meant that at the time of his death he was operating two trucks with possible prospects for greater earnings.
In our opinion, a thorough consideration of the evidence in the record as to how much of the income of the deceased had to be spent for gas, oil, labor, depreciation, insurance, repairs, etc. shows that these expenses consumed approximately twothirds of the gross earnings which left onethird or approximately $3,600 per year to Rufus Swillie as net earnings during 1957 through the time of his death in 1959. This figure is further corroborated by Mrs. Swillie's testimony that according to her cancelled checks over an 18 month period she spent approximately $220 per month for herself and her children and household expenses in addition to which Mr. Swillie gave her about $70 in cash and that the house payments were about $30 per month, which expenditures would total $3,840 a year.
There is also considerable evidence in the record to show that Rufus Swillie was an affectionate and devoted husband and father and that this was a happy young family.
The plaintiff urges, that in our consideration of the amounts to be awarded to the widow and two children for loss of support, we should calculate that these survivors have been deprived of at least $250 per month or $3,000 per year in support, which should be multiplied by Swillie's life expectancy of 36 years, discounted at 5% and then computed according to a financial formula giving the present day value of annuities which in this case would result in a figure of $50,000.
We are aware that a formula similar to that urged by the plaintiff has been used by the Courts of Appeal in this state in Marler v. State, La.App., 78 So.2d 26; Duree v. State, La.App., 96 So.2d 854 and Stephens v. Natchitoches Parish School Board, La.App., 110 So.2d 156. However, in the recent case of Brown v. S. A. Bourg & Sons, Inc., 239 La. 473, 118 So.2d 891, 895 our Supreme Court held clearly that *825 the assessment of damages for loss of support is not a matter of pure mathematics based on a formula and used the following language:
"The district judge was in error in computing the loss of support by multiplying the average annual contribution of the decedent to the support of his wife by the number of years of the life expectancy of the decedent. He made no allowance for discount on the advanced payments. There are likewise other factors to be taken into consideration. The life expectancy of the survivor, the divorce rate, the percentage of remarriages of widows, particularly to second husbands whose earnings are greater than those of the first, the condition of the health of the decedent, his possible retirement, the possibility of an increase or decrease in his annual earnings, and the change in the value of the dollar over a long period of years are among other factors to be taken into consideration.
"The monetary damages resulting from loss of support cannot be calculated with mathematical exactitude. The are speculative in nature and as in the case of damages for loss of love and companionship, mental anguish and other damages of that character, much discretion must be left to the judge or jury."
The more recent case of Pennington v. Justiss-Mears Oil Company, La.App. 1 Cir., 1960, 123 So.2d 625 is now before our Supreme Court on writs of certiorari under Docket No. 45,446. In the Pennington case the lower court, following the formula of the Stephens and Duree cases, found the deceased husband's annual income to be $20,000, which multiplied by his working life expectancy of 30 years would total $300,000. The court discounted this amount at 5% and awarded the wife approximately one-half, that is, $150,000 for loss of support. The Court of Appeal affirmed the amount of the award, but specifically pointed out it was aware of the Brown case, supra, and was not approving the mere use of a mathematical formula. In its original opinion, rendered on April 24, 1961, 134 So.2d 53, the Supreme Court again expressed disapproval respecting the use of such a formula for awarding damages for loss of support, and by a four to three decision reduced this item of the award from $150,000 to $40,000. However, a rehearing has been granted by the Supreme Court and the matter is set for argument on October 4, 1961, which means that unfortunately we will have to decide the instant case without the benefit of the Supreme Court's final opinion. We do take cognizance that the majority opinion and both of the dissenting opinions of the Supreme Court in the Pennington case reject the use of any precise mathematical formula for the assessment of damages for loss of support. Furthermore, both the majority opinion and the dissenting opinion of Justice Sanders cite with approval McFarland et al. v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183 and Brown v. S. A. Bourg & Sons, Inc. et al., 239 La. 473, 118 So.2d 891 from which latter case we have already quoted above. A review of all of these recent expressions of our Supreme Court indicates clearly that in the fixing of damages much discretion must be left to the trial judge or jury and their decision as to the issue of quantum will not be disturbed unless there is an abuse of discretion. With this as our fundamental guiding principle we will attempt to test the award in this case to determine whether it is excessive or inadequate.
Since the jury in the instant case did not itemize its award, we will begin by stating that as to the loss of love, affection and companionship an award of $10,000 to Mrs. Swillie and of $6,000 to each of the two children, who were respectively four years and one year of age at the time of Swillie's death, is proper under the evidence and the jurisprudence. Furthermore, the special damages for destruction of the truck and funeral expense, totaling *826 $7,205.80, is clearly proved. These two categories of damages total $29,205.80, which subtracted from the total award of $80,000 leaves $50,794.20 of the jury's award which can be allocated to the item of loss of support to the widow and two minor children.
Although plaintiff urges that the deceased had an annual net income of $6,000 and the defendants urge that according to his income tax returns he had an income of only about $1,000 per year, it is our opinion that the evidence shows (for the reasons set out above) that during 1957, 1958 and 1959 Swillie averaged a gross annual income of $11,000 of which one-third was net profit or the sum of $3,666 per year. Using the formula of the Stephens and Duree cases, simply as one test of the jury's award, we would then multiply these annual earnings of $3,666 by his life expectancy of 36 years then discount this figure at 5% and divide it by 2, which would give a result of approximately $62,000. As can be seen, this is not greatly in excess of the $50,794.20 which the jury in this case might have considered as damages for loss of support.
In the Pennington case, supra, Justice Hawthorne, in his written dissent, pointed out that: "To say that the wife under the facts of the instant case has been deprived of only about $1,000 a year over the 30 years of her husband's working life expectancy seems to me to be unrealistic, but this is exactly what the majority decided when it awarded her only $40,000 for loss of maintenance and support." [134 So.2d 59.] Using the same reasoning in the instant case, the award (as we have redistributed it below between the widow and two children) of $28,894.20 to plaintiff individually for loss of support is only about $800 a year for the 36 years life expectancy of the deceased. The award to each child for loss of support is about $600 a year during their respective minorities. Certainly, under the facts of this case, any lesser awards would be unrealistic.
It is our opinion that the total amount of the jury's award in the sum of $80,000 is not an abuse of discretion; however, it is our opinion that an award of $25,000 to each of the children is out of proportion to the award of $30,000 to Mrs. Swillie individually. Furthermore, some allowance should be made for the fact that one child is four years of age and the other is only one year, and consequently will have a longer period of minority during which it will lose support. Accordingly, we will amend the award, leaving the total at $80,000, but itemizing the damages with particularity as follows: To Mrs. Joyce King Swillie individually, the sum of $10,000 for loss of love, affection and companionship, the sum of $7,205.80 for special damages as described above, and the sum of $27,794.20 for loss of support; to Mrs. Joyce King Swillie as natural tutrix of the minor, Pamela Joy Swillie, the sum of $10,000 for loss of support and the sum of $6,000 for loss of love, affection and companionship, making a total of $16,000; and to Mrs. Joyce King Swillie as natural tutrix of the minor, Rufus Scottie Swillie, the sum of $12,000 for loss of support and the sum of $6,000 for loss of love, affection and companionship, making a total of $18,000.
For the reasons hereinabove set forth, the judgment appealed from is amended so as to award to Mrs. Joyce King Swillie individually, the sum of $46,000, to Mrs. Joyce King Swillie as natural tutrix of the minor, Pamela Joy Swillie, the sum of $16,000, and to Mrs. Joyce King Swillie as natural tutrix of the minor, Rufus Scottie Swillie, the sum of $18,000, the three awards totaling $80,000. Otherwise than as herein amended the judgment appealed from is affirmed. All costs of this appeal are assessed against the defendant-appellants.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.